VANSYCKLE v. The THOMAS EWING.
See Case No. 16,877.

---

## Case No. 16,878.

### VANTINE v. The LAKE.

[2 Wall. Jr. 52:[1] 14 Law Rep. 669; 1 Phila. 327; 9 Leg. Int. 47.]

Circuit Court, E. D. Pennsylvania.　Oct., 1850.

COLLISION—WHARF—DAMAGES—COSTS OF REPAIR.

1. A vessel which moors alongside of another at a wharf or elsewhere, becomes responsible to the other, for all injuries resulting from her proximity, which human skill or precaution could have guarded against.

[Quoted in Mills v. The Nathaniel Holmes, Case No. 9,613. Cited in The John Tucker, Id. 7,431; The Energy, Id. 4,485; Meyers v. The America, 38 Fed. 257. Quoted in Humphrey v. Charles Warner Co., 45 Fed. 272.]

2. The schooner L., on entering a dock at high-tide, was directed by her consignees to be moored to an adjoining wharf of which they were lessees, outside of the M. J., a smaller vessel. There was not in the dock during part of

---

3 [From 3 Pa. Law J. Rep. 301.]
1 [Reported by John William Wallace, Jr., Esq.]

the ebb, enough water for the L., though there was sufficient for the M. J.; of which fact the consignees, but not the master of the L., were aware. No objection was made at the time from the M. J., nor any caution given. On the tide receding, the L., on this account, and from the bottom of the dock being banked up in the middle from accidental causes (with which the consignees were also acquainted), careened over on the M. J., crushing her timbers, and causing her to fill and sink. As soon as the danger was perceived, a measure of prevention was suggested by the M. J., but rejected as useless. *Held*, that the L. was bound to know the depth of water in the dock, or at any rate was responsible for the directions of the consignees, who had full knowledge; and that she had not taken proper precaution before or after the injury. The L. condemned in damages.

[Cited in Philadelphia & Havre De Grace Steam Tow-Boat Co. v. Philadelphia, W. & B. R. Co., Case No. 11,085; The John Tucker, Id. 7,431; The Energy, Id. 4,485; Call v. The Addie Schlaefer, 37 Fed. 384; Meyers v. The America, 38 Fed. 257.]

[Cited in brief in McGrew v. Stone, 53 Pa. St. 440.]

3. Besides the costs of repairs in this case, charges for wharfage while repairing; for the time of one of the owners, and of the crew in raising and clearing out the injured vessel; and for the loss of profits to the vessel while sunk, and during the time she was being repaired, allowed by the court in the assessment of damages.

[Cited in Sheppard v. Philadelphia Butchers' Ice Co., Case No. 12,757; The Joseph Nixon v. The George Lysle, 2 Fed. 262; The Belgenland, 36 Fed. 506; Seabrook v. Raft of Railroad Cross-Ties, 40 Fed. 601.]

The libellants were owners of the Mary Jane, a small oyster boat of twenty-seven tons, which was fastened to a wharf on the Delaware. While she was discharging her cargo, the respondents' vessel, the Lake, a much larger vessel (one hundred and twenty-five tons), was hauled into the same dock, and the dock being full, was fastened outside her, to the same wharf. The Lake came into the dock with the high tide, when the water was amply sufficient, but on the ebb, there being not enough water to keep her afloat, she settled in the mud, and careened over. The deficiency of water was so great that she was aground for about five hours in each tide; and as the tide first receded, the Lake being the larger vessel, and fastened to the same wharf with the Mary Jane, held her suspended between herself and the wharf, till the timbers of the Mary Jane were crushed in, when she filled and sank to the bottom; from which she was raised at considerable expense and loss. The libel was for damages accordingly. It appeared from the respondents' answer, that the Lake took her position in her berth by the orders of her consignees, who were the lessees of the wharf, with the precautions usual in such cases; that the libellants took no exception to the manner of fastening the Lake, and gave them no caution or warning, whereby her master could know that she would be aground at all; that her master was altogether ignorant of the state of the dock, and presumed from the orders he received from

the consignees, and from the acquiescence of the master and crew of the Mary Jane, that the dock was sufficiently deep at all times of the tide to keep the Lake from listing. As soon as the crew of the Mary Jane perceived the injury that was about to take place, they informed the master of the Lake, and suggested as the only means of saving the Mary Jane, "to take a purchase from the mast-head of the Lake to the wharf on the south, so that she might be eased off by the flare of her side." This the captain of the Lake refused to do, saying "that it would be of no use." Other means were employed, which proved inefficient. The proximate cause of the Lake's careening was, the banking up of the bottom of the dock at its middle, in consequence of two heavy vessels having formerly rested there; and the consignees of the Lake were aware of this fact, and knew that the water was insufficient for a vessel of her draught.

Mr. Emlen, for libellants.

There has been no act of God in this case, and the damage has arisen altogether from an act of the Lake, which occurred from want of due vigilance in her ordinary and proper business. It was her duty to know what water she drew, and what water she would have in the dock which she was entering. An inquiry from any body about, or a thrust with a pole, would have told her that the water was shallow. Her consignees owned the wharf, and of course did know. Their knowledge is her knowledge. It was no part of the Mary Jane's duty, to keep all or any other vessels apprized of the depth of the city docks. She was minding her own business, and had a right to suppose that the other vessel was minding hers, and a right to suppose nothing about it. Even if the Mary Jane had been improperly moored, still being moored, it was the Lake's duty to keep clear of her, or else so to moor herself as to avoid all injury. This is a well settled rule of the admiralty, with regard to "vessels at anchor." The Girolamo, 3 Hagg. Adm. 173; The Batavier, 10 Jur. 19. The English courts go further on this subject than the present case requires. They did so in The Volcano, quoted, Pritch. Adm. Dig. 129, note, as being in 3 Notes of Cas. 210. In that case the Helena, a brig of one hundred and sixteen tons, came to anchor in Mahomet's Bay, on the coast of Spain. The steamer Volcano ran for shelter from a gale into the same bay, where she took up an anchorage, two cables' length from the Helena, on her starboard bow, with her small bower anchor (weighing but sixteen cwt.) and a chain cable only an inch and a quarter thick. About midnight a hurricane arose, and caused the Volcano to drift: the anchor broke, and though another was dropped, The Volcano, by a sudden sheer, drifted athwart hawse of the brig; and having again come in collision with her, the brig

ultimately went down. It was held, in a cause of damage, in respect of such collision, instituted by the owner of the brig, that there was a want of proper precaution in the position which the Volcano originally took up, and in not letting out more cable and a second anchor.

Messrs. Barnes & Donnegan, for respondents.

Admitting that it was the Lake's duty to know the depth of the water, it is conceded that in point of fact she did not know it: and the question is, can the Mary Jane, having been, herself, to all appearance grossly negligent, recover damages for this want of knowledge? The Mary Jane had been in dock three days before the Lake came there. The tide had been in and out several times during this term. She knew exactly its depth. She sees a large vessel moor beside her, with ropes across; and can readily anticipate the result when the tide goes out. In this state of things and with this certainty of damage, no man aboard the Mary Jane once unseals his lips to suggest a doubt, or to stop the Lake. Damage occurs through a pure accident, which one word, or half one word, from the Mary Jane, would have prevented. What right has she to sue for damages?

GRIER, Circuit Justice [after stating the facts as above]. It cannot be pretended that the injury from this collision was caused by any fault of the libellants' vessel, or that her master or crew were in any way to blame for the result, unless we admit what the answer assumes, that they were bound to know the depth of water necessary to float the Lake, and to give her notice to keep farther off, because the dock was not deep enough to float her at low tide. But I think this assumption is entirely without foundation. The Mary Jane was fast to the wharf, and her master and crew attending to their own business in unloading her cargo. They were bound to know whether the depth of water was sufficient for their own vessel; and the master of the Lake was bound to know how much water his own vessel drew, and whether the dock would float her. Moreover, she drew into the wharf by the orders of the consignees, who were lessees of the wharf, and who did know that the water was insufficient for the draught of the Lake, and who did know that the bottom of the dock had been banked up in the middle, which is alleged to be the proximate cause of the Lake's careening over on the Mary Jane. The master of the Lake, then, was bound to know whether the dock would float his vessel, and not only so, the consignee, under whose order he acted (and who pro hac vice acted as his pilot), did in fact know the state of the bottom, and the depth of the water in the dock, for the fact is brought to light by the very person who gave the

direction. Now the answer does not allege that there was any vis major, or inevitable accident which caused the injury, nor indeed was there any. But it is imputed as a culpable negligence in the libellants, that they did not give notice to the respondents, of a fact of which the libellants were ignorant, and not bound to know, and which those who ordered the respondents' vessel to take that position actually did know. Without insisting on the fact that the master of the Lake refused to use the only probable means of saving the Mary Jane, when informed of her situation, it seems to me, that he was to blame in not taking proper precautions both before and after he was aware of the injury likely to accrue to the libellants' vessel from the position in which he moored the Lake; and he has failed to make out a case of unavoidable accident or vis major, which no human skill or precaution could guard against. The case of the Volcano [3 Notes of Cas. 210; Pritch. Adm. Dig. 129, in note] [2] cited at the bar resembles the present in some respects. [The Helena, a brig of 116 tons, came to anchor in Mahomet's Bay, on the coast of Spain. The steamer Volcano ran for shelter from a gale into the same bay, where she took up an anchorage, two cables' length from the Helena, on her starboard bow, with her small bower anchor (weighing but 16 cwt.) and a chain cable only an inch and a quarter thick. About midnight a hurricane arose, and caused the Volcano to drift; the anchor broke, and, though another was dropped, the Volcano, by a sudden sheer, drifted athwart the hawse of the brig; and having again come in collision with her, the brig ultimately went down. It was held, in a cause of damage, in respect of such collision, instituted by the owner of the brig, that there was a want of proper precaution in the position which the Volcano originally took up, and in not letting out more cable and a second anchor.] [2] The precautions taken by the Volcano were amply sufficient, but for the hurricane which her commander had not foreseen, or probably could not foresee; but not having taken proper precautions against any hurricane which might possibly arise, he was held liable. Here the state of facts which caused the respondents' to come into collision with the libellants' vessel, was actually known to the person who pro hac vice was the commander, or under whose directions the Lake was moored; but no precaution was taken to avoid the collision which afterwards took place. Moreover, there was a refusal by the master of the Lake to use the only probable means of avoiding the injury, while yet in his power to have done so.

The libellants are entitled to a decree for the amount of damages incurred, to be assessed by the clerk, to whom the case is referred for that purpose.

[2] [From 14 Law Rep. 669.]

The clerk, having afterwards reported on the amount of damages sustained, exceptions to his report were filed, on the ground that he had allowed charges for wharfage for the Mary Jane while being repaired; for the time of one of her owners, and of her crew while raising and clearing her out; and for the loss of profits to the vessel while sunk, and during her repairs. But THE COURT, after argument, confirmed his report.