Acheson, D. J.
On the twelfth day of November, 1877, the libellant’s steam-tng, the Joseph Nixon, with a tow of 11 pieces — nine thereof being loaded coal barges — was proceeding down the Ohio river on a voyage from Pittsburgh to Cincinnati. For several hours during the morning of that day the Joseph Nixon had been closely followed by the respondents’ steam-tug, the George Lysle, which, with a tow of loaded coal barges, was also proceeding on a voyage down the Ohio. At about noon of said day, when the boats had reached a point nearly opposite the town of East Liverpool, in the state of Ohio, the forward end of the tow of the George Lysle collided with and ran into the wheel of the Joseph Nixon. The day was calm and clear. The Joseph Nixon was in proper place, and was properly navigated immediately before and at the time of the collision, and was plainly in sight of the pilot of the George Lysle. The latter boat gave the former no signal or warning. It was the clear duty of the George Lysle (which was the faster boat) to slacken her speed or adopt precautions to avoid collision. Whitridge v. Dill, 28 How. 448. By the exercise of ordinary care on the *260 part of the pilot of the George Lysle the disaster would have been averted.
Upon this branch of the case there is little conflict in the testimony, and I find, without hesitation, that the collision was entirely the result of negligence on the part of those in charge of and navigating the George Lysle, and that the Joseph Nixon was wholly free from blame.
By reason of the collision the wheel of the Joseph Nixon was partially broken, and was so disabled that the boat was unfit to proceed to her destination without stopping to make repairs. Immediately after the collision men were set to work to clear away the wheel and put it in condition to turn. While this was going on the boat and her tow floated down the stream. About the time the wheel was clear and free to move the captain consulted his pilot in respect to the best place to land for repairs, and the pilot recommended New Cumberland, Ohio, as a proper place for the purpose. New Cumberland is about 10 miles below the place of collision. Before reaching New Cumberland the tow of the Joseph Nixon got aground at a point in the river about seven miles below the place of collision, called “The Clusters,” and in consequence the boat was detained there several hours. During the evening of the same day, however, the boat got afloat part of her tow, and proceeded with it to New Cumberland, and there landed and tied up for repairs. Subsequently, and before the boat resumed her voyage to Cincinnati, the rest of the tow was taken off the bar at “The Clusters,” without loss.
It is claimed by the respondents that if the Joseph Nixon was in the disabled condition alleged by the libellant, the boat should have landed as soon as possible after the collision ; that there were convenient and suitable places for speedy repairs above “The Clusters,” and that it was improper to go so great a distance as New Cumberland before landing. Upon this point the testimony is conflicting. I think, however, that the captain and pilot of the Joseph Nixon were the best judges of what was proper to be done in the emergency which was upon them; and I am of opinion that the evidence as a whole *261 does not convict them of any error of judgment. Moreover, the short detention at “The Clusters” did not cause any material delay in repairing the broken wheel. It was found necessary to send to Pittsburgh for materials and a ship carpenter to make the necessary repairs, and the repairs were not completed until the end of three or four days, although all reasonable diligence was exercised. In the meantime the water had fallen so much that when the repairs were completed the boat could not resume her voyage, but was compelled to remain at New Cumberland until the next rise. By reason of the low stage of water the boat was not able to leave New Cumberland, with her tow, until November 23,1877, when she resumed her voyage and completed it.
The libellant claims damages to the amount of $1,298.07. The claim is of a threefold nature, and embraces — (1) The Bum of $198.80, being the cost of the repairs and necessary incidental expenses; (2) the sum of $486.98, being a loss on certain coal; (3) the sum of $612.49, being the loss of profits upon the trip or voyage.
First. The libellant is clearly entitled to recover the costs of the repairs and the necessary incidental expenses connected therewith; and these I find to amount to the sum of $198.80, the items thereof being specified in the bill of particulars annexed to the libel.
Second. The second item of the libellant’s claim grows out of the following facts. The libellant was the owner of 64,906 bushels of the coal in the tow of the Joseph Nixon. This coal he had sold-deliverable on that rise to certain parties at Cincinnati. The contract price was 8 cents per bushel for part of the coal, and 7| cents for the rest. In consequence of the collision, and the interruption of the voyage which ensued, the coal did not reach Cincinnati in time to be delivered to the purchasers according to the terms of the contract, and they supplied themselves with other coal. When the libellant’s coal reached Cincinnati he was compelled to sell it, and did sell it, at the then market price, and thereby sustained an average loss of three-fourths of a cent per bushel, the difference between the *262 contract price and the market price. His loss was $486.78. The evidence on this subject appears in the testimony of •Joseph Nixon, at page 67 et seq., and of John F. Kelling, at page 146 et seq. It does not appear that there was any market for coal at New Cumberland, or that the libellant could have done anything to avert or lessen the loss.
The respondents insist that they ought not to be charged with this loss. But why not ? Upon what just principle can it be thrown upon the libellant ? His loss was neither remote, speculative nor uncertain. It was an actual loss, and the direct result of the collision. If the rule of indemnity or compensation is to prevail, the damages decreed to the libellant should embrace the loss he sustained on his coal. It has been held that the owner of the injured vessel may recover for freight lost by reason of the collision. The Atlas, 3 Otto, 307. And in Van Tine v. The Lake, 2 Wall. Jr. 52, there was an allowance for loss of profits to the vessel during the time she was being repaired. Was the libellant’s loss on his coal any less direct or certain than such loss of profits, or a loss of freight earnings ? I am of opinion that the second item of the libellant’s claim is well founded and should be allowed.
Third. But the item as set down in the bill of particulars —“loss on trip, $612.49” — stands on a different footing. This estimate is made by the libellant upon a comparison of the net earnings of the boat upon a prior and subsequent trip. His opinion as to this supposed loss is no doubt an honest one. But his own witness, J. W. Clarke, in answer to a question as to the probable profits of that trip, said: “It is a pretty hard thing to figure that thing up. If she made a steady trip she wouldn’t make very much. ” Page 187. ■ If it be conceded that such loss of profits would be allowable in a proper case, the claim as here presented, it seems to me, is not satisfactorily established. It rests largely upon mere conjecture. Moreover, after the interruption of 11J days, the trip was resumed and completed.
A more reasonable claim set up by the libellant is that for *263 demurrage or compensation for the detention of the Joseph Nixon while she lay at New Cumberland. The evidence tends to show the boat was worth $50 per day after all proper deductions. I do not, however, think the libellant has shown himself entitled to any demurrage for the seven and one-half days during which the boat lay at New Cumberland awaiting a rise in the river after she was repaired. The stage of water during that time was not sufficient to float the boat’s barges, which drew six and one-half feet. But it does not clearly appear that the boat herself might not have been employed, nor was it shown that she would have been profitably employed during those seven and one-half days had she reached Cincinnati without interruption to her voyage.
The allowance of demurrage, however, during the four days the boat was undergoing repairs is justified, if not imperatively required, by the decision in The Cayuga, 14 Wall. 270. I have fixed the demurrage at $30 per day. In view of the inexcusable character of the collision, I do not think the respondents can justly complain of the amount so allowed.
The libellant’s damages will, therefore, be assessed as follows :
Costs of repairs and necessary incidental expenses - - - - - $198 80
Loss on coal - • - 486 78
Demurrage - 120 00
$805 58
—with interest from December 1, 1877-
Let a decree in favor of the libellant be drawn in accordance with the.foregoing opinion.