## The Westernland.

## The C. H. Valentine.

*(District Court, S. D. New York.   July 3, 1885.)*

COLLISION — HARBOR REGULATIONS — IMPROPER ANCHORAGE — RUNNING INTO
OBVIOUS DANGER.

Where the schooner C. H. V. anchored nearer the Jersey City shore than the
harbor regulations permitted, and in a situation that involved clear and obvious
danger of collision upon the backing out of the steamer W. in the strong ebb-
tide, and the schooner, being notified in time and requested to drop astern,
neglected to do so, though she might have done so without difficulty, and
the steamer thereupon backed out, and a collision ensued, *held,* that both were
in fault, and the damage and costs were divided; the schooner, for not drop-
ping astern after seasonable notice; the steamer, for running out into an ob-
vious danger, instead of first procuring the harbor master to enforce the regu-
lations, or offering to assist the schooner astern.

In Admiralty.

*Jas. K. Hill, Wing & Shoudy,* for libelant Curtis and the schooner
C. H. Valentine.

*Biddle & Ward,* for Randle and the steam-ship Westernland.

BROWN, J.   The above are cross-libels brought in behalf of the re-
spective owners of the schooner Valentine, and of the Belgian steam-
ship Westernland, to recover the damages sustained by each, arising
from a collision which occurred in the North river in the afternoon
of December 13, 1884, about opposite Morris street, Jersey City, some
200 yards from the shore.   The schooner was at anchor, and the
steam-ship, in backing out with the aid of tugs in the ebb-tide, was car-
ried down against the schooner, so that the bows of the latter struck
the port quarter of the steamer, doing some injury to both.   My con-
clusions of fact are as follows:

1. The schooner was at anchor at considerably less than the re-
quired distance of 300 yards from the Jersey shore; probably less than
200 yards.

2. The tide was strong ebb; there had been a freshet in the river,
and the current ran down all day.

3. The mate of the schooner, who was on board, received several
timely warnings of the necessity of dropping down the stream, in or-
der to make room for the steamer to come out at her appointed time.
There was no difficulty in the schooner's dropping far enough astern
to be out of danger, had the mate been disposed to do so.   Measures
for this purpose were not taken until some time after the steamer had
started, and the collision was seen to be impending.   The schooner
had plenty of spare cable; and had attention been given to the steamer,
even when she started, there was still time to have dropped astern,
out of the way of danger.   The schooner must therefore be held liable
for anchoring inside of the prohibited limits, and in a place of danger;

and after repeated notice of the necessity of moving, for having neglected the means of doing so that were at her command, and persistently remaining in the way of the Westernland.

4. It was not customary for the steamer to come out upon the ebb tide. The difficulty of holding her up against the strong ebb was well known, and the danger of collision with the schooner was perceived and understood by all who were engaged in taking the steamer out. In this situation it was not enough for the steamer merely to give notice to the schooner, as she certainly did, in ample time. Although the schooner was negligent, and in an improper place, the steamer had no right either to run her down recklessly, or to move out in a way that, as was perceived beforehand, was almost certain to result in collision. I do not doubt that in the act of backing out, and in the working of the tugs, all was done by the steamer that was practicable to be done to keep her up; but she was not justified in starting until her way was free from obvious probable danger. She should first have proffered aid to move the schooner, and if that were not accepted, she should have applied to the harbor master to enforce the regulations. The paramount duty of vessels to avoid collisions by all reasonable and practicable means must be inflexibly enforced.

I must therefore hold the steamer also in fault. The result is that the damages must be divided, and a reference ordered to compute the amounts if the same are not agreed upon. There being cross-libels, and both held in fault, the costs will be also divided.