## HUMPHREYS v. CHARLES WARNER CO.

*(District Court, D. Delaware. January 19, 1891.)*

COLLISION—ANCHOR WATCH—NEGLIGENCE.

> A heavily laden schooner, while being towed to a wharf in a river at ebb-tide, ran aground in a position where, unless secured by a stern-line to the wharf below, she would swing, on floating, into a steamer lying at the wharf above. There was some testimony to show that a promise was made by the steamer's master to move his vessel when she floated. *Held*, as the master of the schooner knew that no watch had been set on the steamer, and had set no watch on his own vessel, or made any precautions to avoid a collision, but trusted entirely to some one waking up on the steamer at the proper time to get her out of the way, he was negligent, and his negligence was not excused by the indefinite promise of the steamer's master. *Vantine* v. *The Lake*, 2 Wall. Jr. 52.

In Admiralty.

Libel *in personam* by Joseph H. Humphreys, master and part owner of the steamer Fannie H., against the Charles Warner Co., owners of the schooner Sandsnipe, for damages for collision.

*Bradford & Vandegrift*, for libelant.

*Benj. Nields*, for respondents.

WALES, J. The libelant is the master and part owner of the small steam-boat Fannie H., which, on the 10th of August, 1888, was moored along-side of the city wharf on the Christiana river, a short distance west of the foot of Church street, with her bow pointing down the river. She was employed during the summer in carrying fruit and vegetables from the vicinity of Salem, N. J., to Wilmington, and had come in on the morning of the day named between 11 o'clock A. M. and 12 M. Late in the afternoon of the same day, while the steam-boat was remaining in the position just described, the defendant's schooner, Sandsnipe, loaded with 85 tons of sand, was towed up the river by a tug, with the purpose of making fast at a wharf below the Fannie H., but, the tide being ebb, the schooner ran aground within a few feet of the steam-boat. The tug, after an unsuccessful effort to pull the schooner into deeper water, cast loose and went off. Both the steam-boat and the schooner were now aground; the latter lying with her bow somewhat up the river, and at an acute angle with the starboard side of the former. The schooner's stern was out towards the channel. A bowline was run from the schooner across the bow of the Fannie H., and made fast to a post on the wharf below. The vessels were not more than 40 feet apart, and, from their relative positions, it was inevitable that when the schooner should float, on the next flood-tide, she would swing around, and run into the steam-boat, unless some precautions were taken to prevent the collision. The libel alleges that the necessary precautions were not taken by those in charge of the schooner, whose duty it was to make them, and that the collision, which occurred on the rising of the tide, was in consequence of their neglect; and hence this suit by the libelant and other owners for the injury sustained by their boat, and for the loss of freight while she was undergoing repairs.

The sole defense is that the libelant promised that he would move the Fannie H. further up the river as soon as she floated, and allow the schooner to swing in with the tide, and take her place, and that, as the steam-boat was of lighter draft, and would float sooner than the Sandsnipe, the change could have been easily made, and without inconvenience to the libelant. The libelant denies having made such promise, and on this point there is a serious conflict of testimony. The schooner drew about one foot more than the steam-boat, but there is no evidence to show that the latter was actually afloat before the former. On this and on some other matters the testimony is silent or unreliable, arising from the fact that the depositions were not taken until nearly two years after the occurrences to which they relate. Much allowance must therefore be made for the defective recollection of the witnesses, as well as for more or less of prejudice or bias on the part of some of them. The steam-boat was lying at her customary landing place, and where she had the right to remain as long as she paid wharfage, and until she had unloaded. The weight of the evidence is conclusive to the effect that a stern-line, run from the schooner and made fast to the wharf below, would have made her secure, and have prevented the collision. It is not disputed that the libelant, when first requested to move his boat, positively refused to do so, giving as one reason for his refusal that his cargo was not yet unloaded; and there is no evidence of the offer of any inducement or consideration having been made to him by which he was led to change his mind. The most satisfactory conclusion I have been able to reach, after an attentive reading of the testimony, is that there was a misunderstanding on the part of the schooner's captain as to the intention of the libelant. It is quite probable, as stated by one witness, that the libelant did say that he would move on the flood-tide the next morning; but it does not follow from that expression that he meant to convey the idea that he would move out as soon as his boat should be afloat. Newell, a disinterested witness, and who was the go-between of the captains of the respective vessels, says that his understanding of what the libelant promised was that he would move in the morning as soon as he could unload. It was expected that both vessels would be afloat between half past 11 and 1 o'clock at midnight; and the libelant, in disclaiming the alleged promise, says that he never proposed to sit up all night and watch, and Capt. Hickman of the schooner says that he did not expect him, or any one else, to do so, but supposed that some one would wake up at the proper time. It thus becomes difficult to discover upon what precaution Capt. Hickman relied to prevent an otherwise certain result. He admits that a stern-line would have prevented the collision, but says that he countermanded the order to put one out after the libelant had agreed to move as soon as the Fannie H. floated; while at the same time he knew that no watch was set on the steam-boat or on his own vessel, on the deck of which five men were asleep at the time of the collision. There was no harbor regulation requiring the steam-boat to have a watchman or a light during the night, and, in the absence of any such regulation, she was guilty of no negli-

gence. *The Granite State*, 3 Wall. 310; *The Bridgeport*, 14 Wall. 116. Capt. Hickman says: "If there had been no promise, it [the collision] would have been our fault, but under this promise I do not think it was our fault." The theory of the defense places the responsibility for the collision on the libelant's promise, but I have been unable to gather from an examination of the testimony that there was any such definite and specific promise, or undertaking, on the part of the libelant, that he would move his boat as soon as she floated, which relieved or exempted the schooner from taking all possible precautions and means to avoid the collision. The law strictly enjoins upon every vessel, on entering a port or harbor, the duty of exercising the utmost care and vigilance in keeping clear from other vessels which may be moored at a wharf, or anchored outside of the channel; and a vessel which moors along-side of another at a wharf, or elsewhere, becomes responsible to the other for all injuries resulting from the proximity which human skill or precaution could have guarded against. *Vantine* v. *The Lake*, 2 Wall. Jr. 52. With a stern-line and the use of the windlass the crew of the Sandsnipe, on the rising of the tide, could have heaved her into her berth below the Fannie H. with very little trouble. This course should have been adopted. But Capt. Hickman, under a misapprehension of what had been said by the libelant, chose to take the risk of leaving the schooner in such a place and condition that she would be sure to run into and damage the steam-boat unless the latter should get out of the way, which she was not bound to do; and he cannot be excused for this neglect, amounting almost to recklessness, by saying that he trusted to some one waking up in the nick of time to prevent any harm being done. It was clearly his duty to have set a watch on his vessel, and to have managed her in such manner as to avoid doing injury to any other craft. It is hardly conceivable that the libelant would have voluntarily subjected his frail boat to the peril of a collision with the heavily loaded Sandsnipe had he believed, or supposed, that he was under any obligation to move the steam-boat as soon as she floated. It is more probable that he trusted to the performance of an admitted duty by the schooner, and, had he known that the latter was not to be secured by a stern-line or other means, he would have put his own boat in a place of greater safety.

Let a decree be entered for the libelant, with an order of reference to ascertain the damages.