---

THE C. E. PAUL.

(District Court, D. New Jersey. September 1, 1909.)

1. SHIPPING (§ 81*)—LIABILITY OF VESSEL FOR TORTS—NEGLIGENCE OF MASTER.

Where it was necessary that a heavily laden barge moored alongside a wharf should float out with the ebb tide to avoid grounding, owing to the shallow water near the wharf, a scow which moored outside of her was

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

bound not to interfere with her free movement, and was liable for her injury by being so confined that she was obliged to rest on the uneven bottom.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 344; Dec. Dig. § 81.*]

2. SHIPPING (§ 81*)—LIABILITY OF VESSEL FOR TORTS—JOINT LIABILITY.
Where the plain fault of one vessel was sufficient to account for the injury of another, the latter is not to be charged with contributory fault, in the absence of clear proof.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 344; Dec. Dig. § 81.*]

In Admiralty. Suit by the Newbold Whiting Company against the barge C. E. Paul. Decree for libelant.

A. H. Swackhamer, for libelant.
Wilson, Carr & Stackhouse, for claimant.

RELLSTAB, District Judge. During the night of the 23d, or the early morning of the 24th of April, 1906, the barge of the libelant sank, with its cargo of chalk, while moored at its wharf in Big Timber creek, a navigable, tidewater stream. The barge had been so moored for several weeks prior thereto, awaiting the discharge of its cargo. No one was in charge at the time it sank, and no one testified to seeing it sink. Its sunken condition was discovered by the night watchman of the libelant, about 1 o'clock in the morning of the 24th.

On the 22d the claimant's barge or scow C. E. Paul (hereafter called the scow), loaded with stone, was brought alongside of the barge and moored; the stern of the scow being fastened to the wharf by two lines running across the stern of the barge, and the bow by a line which was fastened either to a cleat on the barge's bow or to the wharf by crossing the bow of the barge. There is a dispute as to whether the stern lines crossed only a corner of the whole of the barge's stern; also whether the bow line stretched across the barge's bow to the wharf, or was fastened to a cleat on the barge's bow; but it is immaterial, in view of the conclusions I have reached as to the duty of the scow, to determine which of these contentions is right.

The libelant charges that the scow was negligently fastened to said barge or wharf, and that by reason thereof, and the rise and fall of the tide, the scow ran into and rested on the top of the barge in such a manner as to cause it to be filled with water and to sink. The claimant, in addition to denying such negligence, avers that the scow never collided with the barge, and that the barge sank because it was unseaworthy.

The creek bottom underneath the barge was uneven. Along the wharf there was a bank three feet wide, and the barge, when sunken, rested on two humps, one at either end, and gave way in the middle under the strain. The barge drew six feet of water, and there was only three feet of water at low tide, where she was moored. It was necessary, therefore, if the barge was not to ground, that she should float out with the ebb tide. When sunk, the barge listed towards the middle of the stream, the bottom close to the wharf, and the top some

three feet therefrom. The lines from the scow crossing the barge were so taut that they could not be loosened at the wharf ends.

There was sufficient unoccupied wharf at one end of the barge to avoid the necessity of the scow's mooring along its side, if the wharfage itself was in good enough condition to tie to. There is some dispute in the evidence as to the condition of this wharfage; but assuming that its condition was such as to not permit of a proper fastening, and that there was need for the scow to moor where it did, it was the duty of the scow to so moor as not to interfere with the free movement of the barge already there. It is no defense to show that the condition of the creek's bottom underneath the barge, or the depth of the water there at low tide, was unknown to those in charge of the scow. Both boats were heavily loaded, and the barge, being at the wharf when the scow came there, was entitled to an unobstructed passage to float out with the ebb tide, and when the scow moored alongside of the barge, using it as a fender or wharf, it was bound to see that such right was not obstructed or interfered with.

In Vantine v. The Lake, Fed. Cas. No. 16,878, 2 Wall. Jr. 52, it was held that:

"A vessel which moors alongside of another, at a wharf or elsewhere, becomes responsible to the other for all injuries, resulting from her proximity, which human skill or precaution could have guarded against."

If the barge, on the ebb tides that occurred between the arrival of the scow and the sinking of the barge, could have floated out, except for the presence and mooring of the scow, and she went aground because the scow hampered her movements and prevented her floating out, and either from the result of her listing, or her seams giving way under the strain referred to, she filled with water and was unable to rise with the incoming tide, the scow is responsible for the resulting damages. A fortiori, if the fastening of the scow, whether across or to the barge, forced her to list with the ebbing tide, and held her down and against the wharf, during which she filled and was rendered incapable of floating when the tide changed. Meyers v. The America and The Nile (D. C.) 38 Fed. 256; Vantine v. The Lake, supra; Call v. The Addie Schlaefer (D. C.) 37 Fed. 383.

There is nothing in the case that permits of a finding that the barge was unseaworthy, or that it was moored in such a way as to prevent it from adjusting itself to the ebb and flow of the tides. It was old, considerably the worse for wear, and carried some water, but not enough to make it unseaworthy. It was serviceable for the uses to which it was put. It had responded to the flow and ebb of the several tides, while it lay moored awaiting the discharge of its cargo. It was floating when the scow was moored, and during each of the two flood tides that ensued between that time and the sinking thereof.

Some other reason than that it was unseaworthy or improperly fastened must be found to account for its sinking. This, in my opinion, is found in the manner in which the scow was moored alongside. In mooring the scow where he did, its captain was considering only the safety of his own boat. He declined to moor along the unoccupied portion of the wharf, because, as he said, he was not satisfied he had

enough water there, did not know anything about the place, and did not care to take the risk of going there. He was in duty bound to consider the interest of the boat already at the wharf as well as his own. His very lack of knowledge of the depth of water along the wharf at low tide, or the character of the creek bottom, should have impelled him to obtain such knowledge, and determine whether this loaded barge could safely ride the tides in case he moored alongside. In not doing so he lacked the particular information essential for the determination of how his boat should be moored so as not to interfere with the free action of the barge in adjusting itself to the tides.

According to his own testimony he moored at high water, while the barge was close to the wharf. He fastened the stern of his boat to the wharf by running two lines across the corner of the barge, and the bow of his boat to a line fastened to a cleat on the bow of the barge, with only two feet of slack. What is a proper fastening, when one boat uses another for a wharf or fender, depends entirely upon the conditions in which the latter boat is placed. Such a fastening as the captain of the scow made in this case might be proper under some circumstances, but, in my opinion, was not under the facts in this case. Neither in the allowance of slack nor the method of running his fastening lines did he exercise the degree of care required under the conditions then confronting him. If the mooring had been made at low tide, and the inner boat afloat, an allowance of two feet of slack might have been sufficient for the utmost need of room of such inner boat; but the giving of only two feet of slack at high tide, with the inner boat hugging the wharf, in view of the depth of the water and the character of the creek bottom along this part of the wharf, did not give sufficient play to enable the barge to float properly with the ebbing tide.

The method of running the lines also may or may not be proper, according to the circumstances. The outside boat, in making its fastenings, must not run its lines so as to bind or unduly hamper the movements of the inner boat. If the lines are run at low tide, and they did not then unduly bind or hamper its movements, it would be a strong indication that the change of tide would not add any greater burden to the inner boat in this respect. When the lines are extended at high tide, however, no such indication would be present. The inability to cast off these lines at their wharf ends, upon the discovery that the barge was sunk, and the chafing marks made by such lines subsequently discovered on the barge, convince me that the lines run out by the outer boat did unduly bind and hamper the movement of the barge on the ebb tide.

During the ebbing tide, in view of the sloping character of the creek bottom, greater depth of water would be under the outer boat, and as she responded to the action of such tide, the mooring lines, with two feet of slack, would soon become taut, and necessarily hold back the inner boat and cause her to ground, as she needed at least 10 feet of play to avoid grounding at low tide. And inasmuch as she would be grounded before low ebb, she would not only bear the weight of her own cargo, but some of the weight of the outer boat.

which continued lowering until the tide became slack. This would cause her to list more, and to be more firmly imbedded in the creek bottom, than if she were merely carrying her own weight; making it more difficult for her to rise with the incoming tide. That a barge thus burdened should eventually open her seams, or otherwise spring a leak, is not strange.

Not having knowledge of the depth of the water at low tide, or the character of the creek's bottom along the wharf, and having moored at high water, the captain of the scow, in addition to allowing more slack and the stretching of his lines so as not to unduly hold in the inner boat on the ebb tides, should have been alert to note the effect his mooring had on the barge, as the tide ebbed. This he did not do, or he was indifferent to what he observed. He says he never changed or moved the lines. The effect his mooring had on the movement of the barge at ebb tide would demonstrate to any ordinarily careful, prudent master that it was improper, and bound to result in damage to the barge, and that this should be immediately changed. Not moving or changing the lines after opportunity was afforded to judge the effect of the fastenings at the first ebbing of the tide after the scow was moored was as great an act of negligence as the original fastening, if it was not willful disregard of the other's rights. In my opinion, such barge would not have sunk if the captain of the scow had exercised due precaution when he moored alongside. And for his failure in that respect, and in not changing his moorings when it was evident that such barge would sustain injuries if he did not, the scow is liable for all the damages that resulted from such negligence.

The question whether libelant was guilty of contributory negligence in leaving its barge unattended gave me some concern, but I have concluded that inasmuch as its barge was moored at its own wharf, and had ridden a number of changing tides without injury, and the fault of the scow is, in itself, sufficient to account for the sinking of the barge, it, in the absence of clear testimony that such failure to look after the boat was a contributing cause to the sinking thereof, is not to be charged with such negligence. It is not enough to raise a doubt with regard to the management of such vessel. The City of New York, 147 U. S. 72–85, 13 Sup. Ct. 211, 37 L. Ed. 84; The Ludvig Holberg, 157 U. S. 60–71, 15 Sup. Ct. 477, 39 L. Ed. 620; The Oregon, 158 U. S. 186–197, 15 Sup. Ct. 804, 39 L. Ed. 943; The Mexico (D. C.) 78 Fed. 653.

As to the damages: The libelant is entitled to be made whole for all the losses that it has sustained through the sinking of its boat. This would embrace the cost of raising it and its cargo, putting it in as good condition as before the sinking, and the difference between the value of the cargo before and after submersion. The libelant did not ascertain what it would cost to raise the barge with its cargo, but proceeded first to unload, and pursued this only at low tide, working only about three-quarters of an hour each day. After this had been carried on for about six months, it ascertained the cost of raising the barge, and contracted to have it done for $200. The cost of repairs made necessary by such sinking was never ascertained, because before the boat was actually raised it was run into by another vessel, resulting in

additional injury. This necessitated a change in the contract with the wrecker, with the result that the barge was not raised for the libelant, but given to the wrecker, with $200 cash for removing it.

When the barge was sunk, it carried a cargo of about 275 tons of chalk, valued close to $900. Of this the libelant succeeded in removing only 200 tons; the remaining 75 tons being a total loss. The extra cost of removing the 200 tons is said to have been 35 cents a ton, and the value of the recovered cargo is said to have been about one-half its normal value; the difference in value being occasioned by its adulteration with mud. This calculated, the loss would be about $250 on the 75 tons not recovered, and $400 on the 200 tons removed, making a total loss on the cargo of about $650. The libelant also claims that it was compelled to pay 10 cents a ton to unload other cargo that arrived there, because of the obstruction of such sunken barge, and that about 5,000 tons of such other material were unloaded during the 18 months while the barge remained sunk. It does not appear at what part of such period such cargoes were unloaded, and as the libelant unduly delayed the removal of such barge no damage can be had for the extra cost of such unloading. That the cargo was damaged to some extent by being submerged, and that it cost more to remove it because it was submerged, is undoubted; nor can there be any question but that the damage to the chalk increased the longer it remained under water. Whether it was practicable to raise the barge with its cargo, or how much of this damage to the cargo was due to its continued remaining under water, and its added contact with the mud and other foreign substances, was not testified to. The wrecker testified that it cost, all told, to raise and put the barge in proper condition $800; but, as already stated, this barge sustained additional damage by a second mishap, and how much of this cost is attributable to the latter does not appear.

It will be seen from this recital that it is not possible to ascertain the amount of the sustained damages with any certainty. The libelant had it in its power to ascertain the cost of raising the boat immediately after it was sunk, and whether it would be necessary to first unload. This it did not do, and we are left to speculate as to how much of the difference in value of the cargo is due to the submerging, and how much to its continuing under water, and how much of the latter was unavoidable. That it sustained damages to the boat and cargo is clear, as is also the fact that much of the damages to the latter could have been avoided by more prompt action on its part.

An allowance of $200 as the cost of raising the barge, if it had been done promptly, a like amount as the cost of repairs resulting from the sinking of the barge and the strain to which it was subjected while lying on the uneven bottom, if it had been promptly raised, and a like amount as damages to the cargo, making a total of $600, will be allowed libelant, and a decree may be entered for that amount with costs.