## THE CHANCELLOR.

## THE NEW JERSEY.

Circuit Court of Appeals, Second Circuit.
January 14, 1929.

No. 55.

Macklin, Brown, Lenahan & Speer, of New York City (Horace L. Cheyney, of New York City, of counsel), for appellant Howard.

Bigham, Englar & Jones, of New York City (Leonard J. Matteson and A. J. McElhinney, both of New York City, of counsel), for appellees.

Foley & Martin, of New York City, (James A. Martin and Edward E. Elder, both of New York City, of counsel), for appellee M. & J. Tracy, Inc.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge. Libelant's barge Henlopen was loaded with a cargo of coal consigned to the Stamford Gas & Electric Company, at Stamford, Conn., where there was a dock which the Stamford Gas & Electric Company had for its own use. At the time the Henlopen arrived, the coal barge New Jersey, which was light, lay at this dock, and claimant's barge Chancellor lay outside of her, loaded. The Chancellor had a cargo consigned to Fleming, who had a dock across the river and about 1,000 feet from the Stamford Company's dock. She had been towed to the Stamford dock by a Red Star tug and left there without permission of the Stamford Company, as her bargee said, because there was not water enough for her at Fleming's. When the Henlopen was expected at the Stamford wharf, the assistant engineer of the Stamford Company called up Fleming and told him that the Henlopen was coming in and that he wanted the Chancellor moved. Indeed, he said to Fleming that Capt. Howard, of the tug which was bringing the Henlopen, would move the Chancellor; but Fleming objected to having the Chancellor thus moved, because, as he stated, he did not know how the Red Star people would like it.

On the arrival of the Henlopen, the New Jersey and Chancellor were shifted out from the pier. The Henlopen was placed between them and the dock by employees of the Stamford Company, and her master and mate then made her fast to the dock on her port side, and the New Jersey and Chancellor were made fast on the other side of her in that order. The Henlopen was then partly unloaded in the flood tide, and, as the tide began to fall, her lines were slackened, so that she would clear a ridge at the foot of the piles supporting the dock. But the Chancellor, as the tide ebbed, went aground on a ridge in the shelving bottom where she lay, and so listed shoreward that she pushed the New Jersey over against the Henlopen, whereby the latter was squeezed between the New Jersey and the ridge at the foot of the piles next the dock, and sustained damage to the amount of $2,360.

It was argued that the Henlopen was injured because she was not sufficiently unloaded during high water to prevent her grounding, and not because of anything done by the Chancellor. But the Henlopen had been at the same berth several times before, and found that nothing was necessary but to slacken her lines, as she did this time, in order to avoid the ridge at the foot of the dock. It is quite clear that the listing of the Chancellor initiated forces which entirely changed the situation of the Henlopen, and caused her to ground by reason of the impact of the New Jersey, and that the damage she suffered was without fault on her part.

The trial court held the Chancellor solely at fault, because she occupied the berth outside the New Jersey, without right or permission of the Stamford Company, and, by her listing, pushed over the New Jersey and caused the damage to the Henlopen.

 The proprietors of the dock were bound to know the condition of the berth in which they placed vessels, and the fact that the Chancellor was a trespasser did not make her an outlaw. For example, vessels were bound to navigate with reasonable care in respect to her. The Westernland (D. C.) 24 F. 703; The Lady of Gaspe (C. C. A.) 276 F. 900. The same rule was applied by the Supreme Judicial Court of Massachusetts to a vehicle which occupied a Boston street in violation of a city ordinance. Newcomb v. Boston Protective Department, 146 Mass. 596, 16 N. E. 555, 4 Am. St. Rep. 354; The English spring gun cases are analogous. Bird v. Holbrook, 4 Bing. 628; Barnes v. Ward, 9 C. B. at page 420.

Lowery v. Walker, [1911] A. C. 10, illustrates the same principle. There the owner of a savage horse, who knew people were accustomed to cross his land where the horse was kept, was held liable to persons injured by the animal, though they were unlawfully on the premises. Recoveries for injuries to mischievous children in the turntable cases have been allowed on the ground that such accidents might have been foreseen, and unguarded turntables have always allured the young to those places of danger. United Zinc Co. v. Britt, 258 U. S. 268, 42 S. Ct. 299, 66 L. Ed. 615, 36 A. L. R. 28.

When the proprietor does not know of the presence of a trespasser, or have reason to expect his advent, it is hard to imagine how he can be under any duty toward such a contingent invader. But it would seem to be only in such cases that no duty toward a trespasser exists. Rights of action, which have been de-

nied to persons injured by railroads when they were unlawfully on the right of way, belong to this class. St. Louis & San Francisco Ry. Co. v. Bennett (C. C. A.) 69 F. 525; Sheehan v. St. Paul & D. Ry. Co. (C. C. A.) 76 F. 201; Grand Trunk Ry. of Canada v. Barnett, [1911] A. C. 361.

But here the Stamford Company was well aware of the presence of the Chancellor, and when her owner did not move her away ordered the Henlopen moored next the dock, and the other two barges shoved further out, so that the Chancellor lay in a berth where the bottom was shelving and she would rest on a ridge at low tide. If she had stranded and suffered damage thereby, the persons who placed her in an unsafe berth would, under the foregoing authorities, have been responsible in spite of the fact that she was a trespasser. By the act of the persons who placed the Chancellor in a berth where she was likely to ground and list, as she eventually did, the berth of the Henlopen was rendered unsafe. And it was this affirmative act, and not the mere presence of the inanimate Chancellor, that must be regarded as the cause of the injury to the Henlopen, though we do not suggest that the result could be foreseen, or that the cause was "proximate," within the legal definition of the term. The Chancellor did not select the berth she finally found herself in. Her first berth, where her own tug placed her, was safe, for she lay there without trouble over several tides. But she got into the berth where she grounded because pushed into it by the mooring of the Henlopen between the Chancellor and New Jersey and the dock, and not through anything she did herself. In these circumstances, she could not become liable for any damages suffered by the Henlopen, unless she failed in some duty to the Henlopen after the time when she was placed in the berth where her listing injured the latter.

It is contended that the Chancellor should have taken soundings to ascertain the condition of the bottom and the depth of water in the berth to which she had been moved. If, in spite of the general duty of a wharfinger to furnish a safe berth, or give warning of any hidden danger to a vessel which it has placed at its dock (Smith v. Burnett, 173 U. S. 430, 19 S. Ct. 442, 43 L. Ed. 756), it be assumed that the Chancellor should have made soundings in order to be free from fault toward the Stamford Company, yet we can see no connection between a failure to do this and the damage to the Henlopen.

By taking soundings, the Chancellor would

have discovered the ridge on which she grounded, and could have foreseen that she was likely to rest on it at low tide, and perhaps, as a result of this, to list over against the New Jersey. But the discovery would not have informed her that the listing was likely to cause damage to the Henlopen. Nor would it apparently have done any harm, unless there had been a ridge at the foot of the dock next which the Henlopen was moored. The grounding of the Henlopen on this ridge at low tide raised her port side, and caused her to list off-shore and tilt over against the New Jersey, so that her starboard rail was crushed. There is no proof that the Chancellor was aware of the existence of this ridge.

We cannot think that the Chancellor, though having no relation with the Henlopen which she had voluntarily assumed, yet owed a duty to the latter to ascertain the condition of the Chancellor's berth. Still less do we think she was under any duty to discover the ledge in the Henlopen's own berth. These duties, if they existed, would have to be based on the probability of damage to the Henlopen, which the failure to ascertain the condition of both berths would involve. As we have already said, a discovery of the ridge in the Chancellor's berth would have given her no reason to suppose that it would endanger the Henlopen, unless she also knew that there was a ridge on which the latter might ground, if pushed up nearer her dock as a result of the listing of the Chancellor. Surely every vessel lying outside others at a wharf need not ascertain the condition of its own berth and that of all the others as well. Such a rule would impose a serious and novel burden upon shipping, would subject vessels to liability for consequences which could not be foreseen, and would be based on a most slender chain of causation. We hold that the probability of any damage to the Henlopen by the listing of the Chancellor was too remote to render such listing a contributing cause of the injury.

It is also said in connection with the attack upon the Chancellor as a trespasser, that she could have moved away and should thus have avoided all danger to the Henlopen. We need not determine whether the heavily loaded coal barge could have moved without the aid of a tug; but, if so, libelant is no better off, for we have already shown that the Chancellor was not in a place of apparent danger to the Henlopen, but rather of presumed safety. She was put there by others, and owed no duty to the Henlopen, unless the risk of her position to the latter was apparent and the danger could be foreseen.

The C. E. Paul (D. C.) 175 F. 246, relied on by the libelant appellee, is not in point. There a scow was moored against a barge that was next a wharf. This prevented the barge from floating out with the ebb tide, and, by confining her, caused her to take ground and sustain injuries. The scow was held liable for insisting on mooring outside the barge, instead of along the wharf, and for considering only her own safety, and not that of the barge. But here the damage was not due to the original mooring of the Chancellor to the New Jersey, in which there was no danger, but it arose because the Stamford Company changed the position of these vessels, and caused the Chancellor to occupy a berth the condition of which resulted in an unforeseeable injury to the Henlopen.

The whole theory of the trial court is based upon the supposed status of the Chancellor as a trespasser. If she is to be held liable because the Henlopen has suffered damage, she must be so held, not because she herself did anything to occasion the injury, but only because she was in a place where she had no right to be. The reasoning that would make the Chancellor pay damages to the Henlopen, even though they were occasioned by the people who moved the Chancellor into a berth which rendered the position of the Henlopen unsafe, would deny the right of the Chancellor to recover if she had herself been injured by the berth in which she was placed. It could make no difference whether the damages were her own, or those she would have to make good to another, for she would be damaged in either event by the act of a third party.

The libel was properly dismissed against the New Jersey. Not only is it true that all the reasons for holding that the Chancellor is not liable apply to the New Jersey, but there is the additional fact that the New Jersey, which was light, would have exerted no pressure against the Henlopen, if the heavily loaded Chancellor had not listed over against her.

The Chancellor was guilty of no wrong to the Henlopen, and the decree against her must be reversed, and the libel dismissed. The decree is modified accordingly, but affirmed, so far as it dismissed the libel against the New Jersey.