## THE BRITANNIA

(Circuit Court of Appeals, Second Circuit.   February 10, 1914.)

No. 154.

1. TOWAGE (§ 11*)—LIABILITY FOR INJURY TO TOW—INSUFFICIENT DEPTH OF WATER IN DOCK.

The mere presence of a wharf does not give reasonable assurance to the master of a tug that it is a proper place to tie up a tow regardless of its draft.

[Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 11–23; Dec. Dig. § 11.*]

2. TOWAGE (§ 11*)—LIABILITY FOR INJURY TO TOW—INSUFFICIENT DEPTH OF WATER IN DOCK.

A tug which left a barge loaded with ice at a small wharf on Blackwell's Island to lie over night, without any inquiry as to her draft or as to depth of water where she was left, although the master of the tug knew that the bottom in the vicinity was rocky and that the water was shallow in places near the shore, held liable for damage to the barge by settling on the rocks in the bottom when the tide fell.

[Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 11–23; Dec. Dig. § 11.*]

Appeal from the District Court of the United States for the Eastern District of New York.

This cause comes here upon cross-appeals from a decree in favor of libelant for $813.67.   The libel charges negligent towage in leaving the tow at an unsafe berth, where at low tide she grounded on a rocky bottom.   The claimant appeals on the ground that no negligence has been shown on the part of the tug; libelant appeals on the ground of insufficient damages.   The opinion of the District Judge will be found in 196 Fed. 553.

Hyland & Zabriskie, of New York City (Nelson Zabriskie, of New York City, of counsel), for claimant.

De Lagnel Berier and James J. Macklin, both of New York City, for libelant.

Before LACOMBE, COXE, and ROGERS, Circuit Judges.

LACOMBE, Circuit Judge.   The Britannia about 9 p. m. took in tow the barge Doherty having on board 300 tons of ice to be delivered to the workhouse on Blackwell's Island.   He arrived off the Island a few minutes before midnight.   The captain of the barge says she drew loaded 9½ feet and on the night in question about 7 feet.   The captain of the tug says that he "judged by what she had into her" that she drew about 5 feet; apparently he made no inquiry of her master as to her draft.   He says that he proceeded up the channel on the east side of the island towards a long dock he knew of located near the workhouse.   When near it he saw some persons on the shore and called out, "Where do you want this boat, she has got ice for the workhouse," to which one of them replied:   "Right astern."   About 500 or 600 feet below the long dock there was a small dock, which he had

already passed. He then asked if there was some one in authority to direct him where they wanted the boat. To this came the reply, "The watchman says you are above it, go right back there." The master of the tug then said: "The captain (of the barge) objects a little to that place." To which there came the reply, "It makes no matter, that is where we want her, you put her there and leave her there." Without further inquiry, he dropped back and made his tow fast to the small dock. The objection of the master of the tow was apparently to, the size of the dock; the barge was 106 feet long the dock only 40 feet, and he feared she could not be laid up secure against changes of tide; he knew nothing about the locality himself. There were dolphins (groups of piles) to east and west of the line of the dock, and with the assistance of these the barge was laid up securely and to the satisfaction of her master. The tug then left. A few hours later the tide fell and she grounded on a rocky bottom, there being but 5, to 6, to 6½ feet along the face of the dock at low tide.

. The master of the tug had been towing vessels around this harbor a little over 28 years. He was charged, of course, with the knowledge which the chart afforded and with the common knowledge of the different landing places in the harbor which navigators generally possessed. The case does not present a hidden defect about the dock such as a broken spile; apparently it was in proper condition to fulfill the service for which it was constructed. What was the common knowledge of navigators as to this dock is not shown; no one who ever used it was called. A government chart from our own files, corrected to 1912 (the small dock was built from three to five years before), is before us; but, since no witness has marked the several localities upon it, we do not refer to it as evidence on which to base our decision. It is contended on behalf of the tug that the presence of a dock apparently in proper condition is reasonable assurance that vessels may be berthed at it; also, that when her master was told by the watchman to go there, he might reasonably assume it was a safe place. As the master himself expresses it:

"When they said to leave her there, I supposed they knew it was a safe place and a dock they used. I knew it was a rocky shore, but I had no idea they would have a dock where a boat would ground on the rocks and supposed there was plenty of water there."

It is further contended that it would be unreasonable to require a tug always to take soundings before she tied her tow up at a dock of which her master had no personal knowledge. We do not hold that she should; but it is well-settled that the tug must exercise reasonable care and skill in everything relating to the work she has undertaken to perform (The Margaret, 94 U. S. 494, 24 L. Ed. 146), and what is "reasonable care" depends upon all the circumstances of the case.

[1, 2] There are several docks along this side of the island, some long, some short. None of them project far from the shore so that the width of the channel might be maintained as far as possible. The shore all along this side of the island is rocky, a fact known to the master. We cannot assent to the proposition that the mere presence of a dock gives reasonable assurance that it is a proper place to tie up

any vessel, no matter what be her draft. A dock 40 feet long might well be supposed to be intended for smaller vessels than would a dock 300 feet long. The master of the tug had been in the locality before, apparently not infrequently, but had made his landings at the long dock. He had never seen any vessel lying at the small dock, except on one occasion when there was a sand-scow there; another witness tells of sand-scows lying there, they draw from 2½ to 3 feet. Moreover, he knew that even at the long dock to which he was going there was no great depth of water. He said that a vessel drawing, what "they said this ice boat drew," 7 feet, could be docked safely only at the upper or lower end of the long dock; it would be "dangerous to place her in the middle of the dock as she would probably feel the bottom"—at low tide. We think this a suggestive circumstance. If this long dock, which he knew was in general use for landing vessels, had such scant depth of water at its face that it would be necessary to select a particular berth for a barge drawing 7 feet, it might reasonably be inferred that a smaller dock on the same shore 500 feet lower down might also have a scant depth of water at its face.

We do not mean to hold that a tug captain is ordinarily under any obligation to take personal measurements to determine the draft of his tow, or to take personal soundings to ascertain the depth of water at a dock to which he is directed to go. But when he knows that there is probably no great margin of safety between the two, it seems to us that ordinary reasonable prudence would require him at least to ask the master of the tow how much water she drew, and to ask the person who directed him to tie up at a smaller dock than the one he was going to what depth of water there was supposed to be there. The master of the Britannia did neither and for this failure under all the circumstances, to make even such a simple effort to ascertain if the berth was a safe one, on a falling tide, we think she should be held in fault.

The other branch of the case is concerned with the question of damages. Part of the damage resulted from the efforts of the wrecking company to float the barge and get her off the rocks. It being difficult to determine how much damage was attributable to the efforts of the wrecking company, the District Judge gave the libelant one-half only of the total damage shown by the survey. The facts are all very fully set forth in his opinion, which may be referred to. Without repeating them here we reach the conclusion that even if the wreckers committed an error of judgment as to the best time and the best way to get her off, the resulting damage must be attributed to the original fault of the tug in putting the barge in such a position that her removal was necessarily attended with peril. We are not satisfied that any negligence is shown in the attempt of the wrecking company to pull the barge off the rocks; we think they acted with reasonable care and prudence.

The decree should be amended so as to direct that full damages be assessed against the Britannia with costs of this appeal against the claimant.