## THE N. Y. MARINE NO. 3.

(Circuit Court of Appeals, Second Circuit. April 6, 1925.)

No. 320.

Towage ⚖️19—Tug leaving tow at pier not negligent, in not warning against grounding at fall of tide.

Tug, which towed schooner to pier in slip, and which, after directing where lines should be run, left her docked with her crew on board, and did not warn her that she would take the ground at tide fall, not liable for injury to scows on opposite side of slip when she careened at low water.

Appeal from the District Court of the United States for the Eastern District of New York.

Libel in admiralty by the Weehawken Dry Dock Company against the steam tug N. Y. Marine No. 3 (the New York Marine Company, claimant) and the steam tug Jessie Y. Forsyth (the Forsyth Towing Line, Inc., claimant). From decree for libelant against the Forsyth, her claimant appeals. Reversed and dismissed.

Foley & Martin, of New York City (William J. Martin and George V. A. McCloskey, both of New York City, of counsel), for appellant.

Alexander & Ash, of New York City (Edward Ash, of New York City, of counsel), for appellee.

Before ROGERS, HOUGH, and HAND, Circuit Judges.

HAND, Circuit Judge. On January 14, 1922, the schooner St. Johns was taken in tow by the tug Jessie Y. Forsyth, to be laid alongside a pier in a slip at Perth Amboy, N. J. On the other side of the slip and alongside the opposite pier were four or five scows, among them the libelant's scow, Saxon, nearly light. Outside of her lay the loaded scow, Ramsey, with only 6 inches of freeboard. Together they occupied about 52 feet of the slip, which was between 90 and 100 feet in width; the exact width not being shown. The Forsyth was unable to handle the schooner alone, and called to her help another tug, the Marine No. 3. The tugs together worked the schooner around the end of the pier at which the scows lay, and eventually into her berth on the opposite side of the slip, getting her in place about 10 o'clock in the morning. The tide was on the ebb, and the schooner took the ground as she lay at low water. This caused her to careen to port, although moored to the pier by four lines. Either for this reason, or during the shifting itself, the iron corner of the Ramsey broke the side planks of the Saxon about a foot above her water line, and she started to leak. She was taken out that night at about 6 o'clock at high water and put into the adjoining slip, where she sank. These are the damages for which the libel is filed.

There is an initial dispute of fact, which turns upon whether the damage was done as the schooner was pushed into the slip, which on this version was not wide enough to accommodate both herself and the two scows abreast, or whether it occurred as the schooner careened on the fall of the tide. The bargee of the Ramsey was the only witness called for the libelant as to the accident, and his testimony was that the slip was too narrow, and the bow of the schooner pushed the Ramsey against the Saxon, staving in her side at the time. The story of the tugs is that the slip was so wide, that, after the schooner was alongside the pier, there was

from 3 to 6 feet between her and the Ramsey. As the tide fell, the list of the schooner pushed the Ramsey over against the Saxon, and thus caused the injury.

It seems to us more probable that the injury was caused by the list of the schooner, for, if the slip had been too narrow, we should suppose that the schooner's bow would merely have pushed the Ramsey forward, rather than into the Saxon, as happened. If, on the other hand, as the claimant's witness asserts, it was the schooner's list which did the damage, the pressure would have been transferred through the Ramsey perpendicularly against the side of the Saxon. In any event, in this conflict of evidence, we accept what was apparently the finding of the District Judge, who, in his opinion, stated that there was about 6 feet between the bow of the schooner and the Ramsey, after the former was berthed.

This being the fact, the tugs were not at fault. They were not responsible for the rendering of the schooner's lines. Their duty was no more than to put her in place with due care to other vessels in the slip and to leave her there. If subsequently, upon the fall of the tide, the lines rendered, the negligence was the schooner's, not the tug's. It therefore becomes unnecessary to consider who was in charge of the operation, or whether the tug in any event could be held liable.

The libelant argues that it was negligent to leave the schooner where she would take the ground, at least without advising her that this would be the case. But the berth was a safe one, and the case is not like The Britannia, 213 F. 22, 129 C. C. A. 661, or The Britannia, 252 F. 583, 165 C. C. A. 3. The first was a case where the tug left her tow in an unsafe place; the second, where she left her alongside another scow, which was injured when the weather changed. The first case hardly needs consideration at all, and the second is distinguished, because the tow had no bargee on board when the tug made her fast against the scow, which was later injured. While it is true that Pearce, who in the case at bar had charge of docking the schooner, appears to have put out her fasts, it was her master and crew who were responsible for watching her as the tide fell. There is no evidence that Pearce did more than direct where the lines should be run; we cannot suppose that he assumed to charge himself with how they should be made fast. We cannot think it negligence to fail to advise the schooner that she would

7 F.(2d)—39

take the ground at low water. The fall of a tide is not a sudden event, and it must have been apparent to the master, after the schooner began to list, what had happened. He was thereafter charged with a duty either to hold his ship or to warn the scows to move. The tugs were discharged of all duty, once they had safely berthed the schooner.

Decree reversed; libel dismissed.