## THE B. B. NO. 21.

## THE VICTORIA.

## THE DISPATCH.

## BURNS BROS. v. CORNELL STEAMBOAT CO. et al.

## BURNS BROS. et al. v. SAME.

## RED STAR TOWING & TRANSPORATION CO. v. BURNS BROS. et al.

### Nos. 32–34.

Circuit Court of Appeals, Second Circuit.
Dec. 7, 1931.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (Robert S.

Erskine and Henry P. Elliott, both of New York City, of counsel), for appellant.

Alexander, Ash & Jones, of New York City (Edward Ash and Max Taylor, both of New York City, of counsel), for libelant in first libel.

Single & Single, of New York City (Thomas H. Middleton, of New York City, of counsel), for libelants in second libel.

Macklin, Brown, Lenahan & Speer, of New York City (Horace L. Cheyney, of New York City, of counsel), for libelant in third libel.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

SWAN, Circuit Judge.

On the order of Burns Bros., the appellant's tug Victoria took in tow two loaded coal boats for delivery in the slip on the south side of Pier 125 North River, at the foot of West 135th street, New York City. When the tug and tow arrived off the slip, at about 11 p. m. July 5, 1928, entrance to the slip was found to be blocked by a dredge and dumper scow. Another tug was standing by waiting to take out the dumper scow, and it is probable that the master of this tug, if requested, would have shifted the dumper so as to give the Victoria's tow access to the slip; but, without making any such request, the master of the Victoria landed the two coal boats on the north side of Pier 125, about half way in from its outer end. The B. B. 21, the smaller of the two coal boats, was placed alongside of the pier, and the larger, the Dispatch, abreast of and outside the B. B. 21. Both coal boats had open hatches. Each boat was manned by a bargee, and it is contended by the appellant that the bargees requested the master of the Victoria to moor them where he did.

The north side of Pier 125 has no protection from a wind blowing down the river. It is an exposed and dangerous berth for coal boats in a north or northeast wind of 30 miles' velocity, and such boats are rarely landed there. At 11 o'clock on the night in question the wind was only from 9 to 12 miles an hour. Since 5 p. m. rain had been falling, and the wind had shifted from southeast through east to northeast. During the night it hauled further into the north and increased in velocity, blowing at the rate of 30 miles or more an hour after 3 a. m., with a maximum of 36 miles at 4:55 a. m. At some time prior to 6 a. m. both coal boats sank. Neither bargee was available at the trial, and no eyewitness testified to the cause of their sinking. The trial judge found that they were swamped by seas stirred up by the wind, and that the Victoria was negligent in placing them on the north side of the pier under the existing conditions, and was not relieved from responsibility by the consent of the bargees, because they were not offered a "free choice," but only the alternative of being hung up at the end of Pier 125. By this the trial court meant that the master of the Victoria had not suggested to the bargees the possibility of landing them in the slip south of Pier 124, where they would have had a protected and safe berth.

When a tug finds that she cannot deliver her tow at its destination, it is her duty to return the tow to its owner or to tie it up at some safe place and protect it until she can deliver it at the point called for. Cokeley v. The Snap, 24 F. 504 (D. C. N. J.); The American Eagle, 54 F. 1010 (D. C. N. D. Ohio); The Governor, 77 F. 1000 (D. C. S. D. N. Y.); The Thomas Purcell, Jr., 92 F. 406 (C. C. A. 2); The May McGuirl, 256 F. 20 (C. C. A. 2). To leave the boats in an unsafe berth was not a performance of the Victoria's contract of towage. The District Court found that the north side of Pier 125 was an unsafe berth under conditions foreseeable when the tug moored the boats there. Error is assigned to this finding, but the evidence is sufficient to sustain it. Admittedly the berth was exposed and would become dangerous if the wind should increase to a velocity of thirty miles an hour. It was seldom used for coal boats. While the wind was light at 11 o'clock, it was from the northeast, and rain had been falling for several hours. It is common knowledge that a northeast storm is frequently accompanied by high winds. Moreover, there was no necessity of putting the boats in this exposed position. By requesting the shifting of the dumper scow, the Victoria could probably have gotten access to the slip to which her tow was consigned; or, if not, she could have put the boats in the adjacent slip south of Pier 124. As always in judging fault, it is a question of the gravity of the danger, coupled with its likelihood, as compared with the opportunity of avoiding it. Considering the ease of going to a safe berth, it was a fault to choose the exposed one, with the weather what it was.

It is objected that, even if the fault existed, there is no proof that it was the cause of the sinking. True, no eyewitness explained just what happened; but the infer-

ence that the boats were swamped by the seas is entirely reasonable. Appellant's suggestion that the bargees may have been remiss in not using their pumps nor seeking assistance when danger appeared is pure conjecture, unsupported by any evidence. To be relieved from the consequences of his own fault, a wrongdoer must do more than merely suggest the possibility that the tort of another may have intervened. Cf. Alexandre v. Machan, 147 U. S. 72, 85, 13 S. Ct. 211, 37 L. Ed. 84, 85; The C. E. Paul, 175 F. 246 (D. C. N. J.); The Newburgh, 130 F. 321 (C. C. A. 2); The Mexico, 84 F. 504 (C. C. A. 2). The burden of proving that an intervening act of negligence caused the loss was on the appellant. The Bartle Daly, 45 F.(2d) 605 (C. C. A. 2); The Gladiator, 79 F. 445 (C. C. A. 1); The Pensher, Swab, 212.

■ The question remains whether the tug may be exonerated in whole or in part from her fault by the bargees' consent to the unsafe berth. The appellant contends that the owner of a barge is bound by the act of his agent, the bargee, if the latter approves the berth in which he is placed. Reliance is placed upon the language of this court in The W. H. Baldwin, 271 F. 411, 415: "* * * The bargemaster was the agent of the owner as far as the care of the barge was concerned. He acquiesced in leaving the barge in the position the tug left her. * * * These circumstances indicate that the master, and therefore the owner, took the risk of allowing the barge to remain in the position she was in when the tug had fulfilled its service. Monk v. Cornell S. S. Co., 198 F. 473, 117 C. C. A. 232."

Other authorities are cited to a similar effect. The Alice, 157 F. 984 (D. C. S. D. N. Y.); The C. Van Cott, 152 F. 1016 (D. C. S. D. N. Y.); The Willie, 184 F. 279 (C. C. A. 2); The N. Y. Marine No. 3, 7 F.(2d) 608 (C. C. A. 2); The Eastchester, 20 F.(2d) 357 (C. C. A. 2); The Stamford, 35 F.(2d) 55 (D. C. S. D. N. Y.). But in each of these cases the berth was apparently safe at the time the tow was left, and the tug had no reason to know that dangers would arise from which the barge could not extricate herself. Hence the tug had fulfilled her towing contract, and was exonerated from liability for damage occurring later when conditions changed. The limits of the bargee's authority to represent his owner are not clearly defined by the authorities. To put an extreme illustration, it would scarcely be contended that a bargee could change the contract of towage by directing the tug to proceed to a different destination (e. g., Brooklyn) if access to the contract destination (e. g., Manhattan) were available. To hold the request of a bargee that he be placed in an admittedly unsafe berth equivalent to such a request by the barge owner, would give the bargee an implied authority to change the contract different only in degree from the authority denied him in the extreme illustration first suggested. It is true that bargees are required to be competent to attend to what has been termed the "internal economy" of their vessels. Dailey v. Carroll, 248 F. 466, 468 (C. C. A. 2). And this includes certain duties with respect to selection of a berth, as evidenced by the grounding cases. Fahey v. Mayor (D. C.) 49 F. 389, affirmed 61 F. 336 (C. C. A. 2); Hirsch Lumber Co. v. C. Ottaviano & Co., 18 F.(2d) 952 (C. C. A. 2); Bleakley Transportation Co. v. Daniel Roe T. & T. Co. (C. C. A.) 54 F.(2d) 530, opinion handed down this day. As to dangers of this sort, implied authority to bind the owner may be found in the fact that the bargee has been supplied with a sounding pole, and that the dangers arising from an uneven bottom are such as the bargee is supposed to be able to judge as well as the tug master, and such as may often be averted if the bargee properly tends his lines or breasts off from the dock. These cases may well be distinguished from the case at bar, where the dangers of the berth arise from stress of weather—a matter as to which the tug master is supposed to be more competent than a bargee—and leave no opportunity for escape by anything the bargee can do after the tug has left. Having in mind the "feckless folk" who frequently man barges, it would be out of reason to imply an authority in them to assume the risk of such dangers on behalf of the owner of the boat.

Decrees affirmed.