## P. DOUGHERTY CO. v. THE G. M. McALLISTER.

### THE HARFORD
No. 140, Docket 20425.

Circuit Court of Appeals, Second Circuit.
Feb. 7, 1947.

Dow & Symmers, of New York City (William G. Symmers, Wilbur E. Dow, Jr., Daniel L. Stonebridge, and John R. Sheneman, all of New York City, of counsel), for appellant.

Foley & Martin, of New York City (Christopher E. Heckman, of New York City, of counsel), for appellee.

Before L. HAND, SWAN, and CLARK, Circuit Judges.

SWAN, Circuit Judge.

This is an appeal by the owner of the tug "McAllister" from an interlocutory decree in admiralty in favor of the libellant, owner of the sea-going barge "Harford," whose libel sought recovery for damages caused by the stranding of the barge after the tug had taken her to her destination and left her there at anchor. The tug was held liable on the theory that she gave the barge a foul berth. The appellant contends that the tug performed her whole duty when she placed the barge at

the destination directed by the barge-owner in a position as safe as the conditions at such destination would permit.

On the afternoon of January 15, 1945, the appellant received an order from the appellee to take the barge from the Red Hook anchorage "to the anchorage off Port Reading coal docks." The selection of the specific berth at the anchorage was left to the tug which appellant should assign to tow the barge. The tug "McAllister" with the barge in tow arrived at the anchorage off Port Reading at about 8:40 P. M. at which time the tide was running flood with high water to be reached about 10:30 P. M. The captain of the tug selected a point of anchorage and directed the master of the barge to drop anchor, which he did. He paid out approximately 120 feet of anchor chain which was the usual and proper length for the depth of water. The barge was light; she drew 11½ feet forward and 12½ feet aft. She was of the ship-hull type, with a sharp bow and a round stern. Her length was 267 feet and, with the anchor chain she had out, her swinging circle had a radius of approximately 367 feet. At the time and place of anchoring, with her stern tailing with the tide, she was in at least 15 feet of water, but there was not sufficient water for her to float on the falling tide on the Staten Island side of the circle through which she would swing on her anchor chain, there being only 8 feet at mean low water at some points of her swinging circle. The master of the barge was not familiar with the anchorage ground. The tug captain gave no instructions as to the length of the anchor chain and no warning about the shallow water into which the "Harford" was likely to swing. When the tide changed, the ebb current or the northeast wind, or both, caused the stern of the barge to swing toward the Staten Island shore where she fetched up on the bottom at about 11 P. M. The master was awakened by the jar and came on deck but there was nothing he could then do as the barge was already aground. By eight o'clock the next morning, January 16th, the barge had become strained and was leaking badly. On that day a storm occurred which prevented anyone going ashore from the barge to report. An effort was made to haul her forward on the anchor chain, but the anchor moved and the barge did not. The barge master reported to his superiors on the 17th. Efforts to pull the barge off by the use of tugs were not successful until several days later.

■■ In selecting a berth for her tow a tug is chargeable with "such information as is current in the calling." Waldie v. Steers Sand & Gravel Corp., 2 Cir., 151 F.2d 129, 131. Common knowledge ought certainly to include all that the charts of Geodetic Survey disclose about the bottom. These are available to all, and before undertaking a towing job either the tug's master must inform himself from them, or its owner must and instruct the master. In the case at bar it is true, the owner of the barge directed that she be left at the anchorage grounds; he did not, however, designate the precise place where she was to be anchored but left the selection of a safe berth to the appellant. It is also true that from an examination of the chart we have not been able to find any spot within the anchorage grounds where she could have had a swinging circle with a radius of 367 feet in 13½ feet of water at low tide; but there are places within the anchorage where, if anchored fore and aft, she could have ridden safely. The tug gave her no instructions how to anchor and no warning that she would take ground if she swung on a single anchor. The testimony that other barges of equal size had previously been safely anchored within the anchorage grounds justifies the inference that the McAllister either chose a poor place for anchoring or an improper method of anchoring the barge; in either case she gave the "Harford" a foul berth and was properly held liable for negligence in so doing.

The question remains whether the tug may be exonerated in whole or in part, because the barge master consented to the berth and failed to inquire of the tug captain as to the bottom or to take soundings. The duties of a bargee under somewhat similar circumstances have been frequent-

ly considered by this court. In The W. H. Baldwin, 2 Cir., 271 F. 411, at page 415, we said that the barge master was the agent of the owner as far as the care of the barge was concerned; after sounding around the barge, "He apparently was satisfied with the position in which she was placed. These circumstances indicate that the master, and therefore the owner, took the risk of allowing the barge to remain in the position she was in when the tug had fulfilled its service." This case and others were distinguished in The B. B. No. 21, 2 Cir., 54 F.2d 532, 534 because in each of them the berth was apparently safe at the time the tow was left, and the tug had no reason to know that dangers would arise from which the barge could not extricate herself. In the case at bar, the tug did have reason for such knowledge, being chargeable with what the navigation charts show. In The Eastchester, 2 Cir., 20 F.2d 357, where the barge was left at a berth substituted for the agreed berth with the consent of the consignee, we held that the risk in allowing her to remain in a position where on the falling tide she would settle on an uneven bottom close to the dock, was on the consignee, not on the tug; and that the bargee was justified in assuming the berth to be safe and was not required to take soundings. In Nassau Sand & Gravel Co. v. Red Star Towing & T. Co., 2 Cir., 62 F.2d 356, we held that where the barge was left at a wharf and the bargee got no assurance beyond the mere fact that he was given the berth, he must sound, and his failure to do so relieved the tug to the extent of half the damages. This ruling was repeated in Cities Service Transp. Co. v. Gulf Refining Co., 2 Cir., 79 F.2d 521. In N. Y. Trap Rock Corp. v. The Metropolitan, 2 Cir., 128 F.2d 831, 832, we reaffirmed the Eastchester decision and distinguished the two later cases because in neither of them had the consignee accepted delivery at a berth other than that to which the vessel was consigned.

■ None of these grounding cases is applicable to the present situation. The barge owner did not expressly accept delivery at the berth in which the tug anchored her; his orders were to put her in a safe berth. Having failed to do so, the tug cannot escape liability on the theory that the consignee accepted the risk, as in the Eastchester case. Nor can the tug divide responsibility with the barge master because the latter failed to take soundings when the barge came to anchor, as in the Nassau case. Soundings at that point would have disclosed no danger; and it was physically impossible for him to sound at the perimeter of the swinging circle, where only would sounding have disclosed insufficient water. After the barge was aground at 11 P. M. there was nothing the master could do, as the court found. He was rightly held free from negligence.

■■ The appellant urges that the district court was in error in finding that the proximate cause of the damages sustained by the barge was the tug's negligence in leaving her where it did to swing on a single anchor, instead of finding that the damages resulted from the dragging of the anchor during the storm and the failure of the bargee to drop a second anchor. The judge stated in his opinion that there was not sufficient proof that the anchor dragged before the barge went aground and that thereafter there was nothing the master could do. The record does not show these findings clearly erroneous; indeed, we agree with them. To be relieved from the consequences of his own fault, a wrongdoer must do more than suggest that the negligence of another may have intervened. The B. B. No. 21, 2 Cir., 54 F. 2d 532, 534.

Judgment affirmed.