NEWARK TERMINAL & TRANSP. CO. v.
UNITED STATES.
THE MILWAUKEE.
No. 18096.

United States District Court
E. D. New York.
Jan. 18, 1949.

Mahar & Mason, of New York City (Frank C. Mason, of New York City, of counsel), for libellant.

J. Vincent Keogh, U. S. Atty., of Brooklyn, N. Y. (Eugene Rheinfrank, Sp. Atty., Dept. of Justice, of New York City, of counsel), for the United States.

GALSTON, District Judge.

The scow-lighter Milwaukee had been towed by the tug L. T. No. 238, a public vessel of the United States, to Pier 3, Army Base, Brooklyn, arriving there at about 2 a. m., November 29, 1944, loaded, and was placed on the south side of that pier with its starboard side to the dock, bow pointing to the bay, and her stern at a distance from the bulkhead of about 100 feet. The unloading operation was completed at about 5 o'clock on November 30, 1944.

The master of the Milwaukee went ashore for his dinner some time thereafter, for there were regulations prohibiting the use of the lighter's cook stove while in the Army Base. On his return, some time after 7 p. m., he found his boat on the south side of Pier 4, alongside a scow. The starboard side of the lighter was against the scow and about 25 feet from the end of the pier. At that time Olsen, the master of the lighter, found the wind blowing a hurricane, and the water very rough. The lighter was "rolling and bouncing around". On boarding his vessel he found she was in a sinking condition, with two feet of water in the stern. The water was coming in the bow in a "big stream".

Olsen called for assistance from the authorities at the Base, and two tugs were used in siphoning the scow until about 6 o'clock in the morning. Later, at 10 o'clock, three pumps came from the libellant's yard in Newark to keep the scow afloat. On December 1st she was towed to the shipyard.

The defense to the charge of negligence is unseaworthiness.

On the whole the respondent failed to make out a case of unseaworthiness. The Milwaukee was eighty feet in length, thirty feet in beam, and had a hoisting apparatus at the stern. She had been put on dry-dock in 1941 and repaired at that time. Olsen had been master of the lighter for twenty years. Before November 30, 1944, after loading in Newark, the lighter had been used in removal work around the Bush Terminal docks. During such interval apparently there had been no difficulty encountered in respect to her condition. On November 29, Olsen checked his boat and found no water in her at the time that he left for his dinner. Buren, a respondent witness, testified that at the time of the damage he was employed at the Army Base as assistant marine superintendent. He was asked in direct examination: "Q. What would you say as to whether or not a scow, a wooden scow, that permitted water to surge in through a leak such as you have described * * * whether or not technically that scow was seaworthy? A. No, I cannot say anything about that because I had no opportunity to observe the scow from the outside."

He added that in his opinion though, a scow if seaworthy could have withstood waves created by a wind force of a velocity of forty to fifty miles an hour.

The deposition of Captain Berne, a captain in the United States Army Transportation Corps, stationed at New York Port of Embarkation at Brooklyn, who made a survey of the Milwaukee on December 4, 1944, raises a serious question concerning the seaworthiness of the vessel, and though he had made no complaint at the time of the survey concerning alleged bad condition of the caulking seams, he testified that at the bow end, the upper caulking edge of the first plank above the mud-log was deteriorated and the caulking started out. This plank had sprung away from its fastenings somewhat, the heads of the spikes having eaten into the wood. He ascribed the sinking to the deteriorated condition of the planks below the water line. He said: "I found in several places on both sides of the bow, both on port and starboard side, where the caulking showed where it should have been caulked at some period prior to the charter of this vessel, because it had started to come out between the deteriorated edges in various places. Also the planks showed at both corners where they were pulling away from their original fastenings, thereby opening up the seams."

On the other hand, Hansen, a marine surveyor called by the libellant, who had attended the survey which was held on the Milwaukee on December 4, 1944, said that the first plank above the mud-log was "started off at approximately the middle of the boat, a little bit to the port of the seam was open, and below the plank as well as immediately above, that is, the seam between the plank above the mud-log and the mud-log, and the seam immediately above it; both these seams were affected by the plank, the first above the mud-log having been started away from its fastenings". By the expression "started away" he meant sprung outward. Hansen ascribed an impact further up in the bow as the probable cause of such a condition. And indeed that seemed reasonable. He also found a king post on the starboard side aft had been broken and said it was a matter of recent origin. Impact from the side would explain that item of damage.

Hansen had been familiar with the condition of the Milwaukee as far back as 1947, his company having insured it, and in his opinion the general condition of the boat was good. His work led him to periodic inspections of the libellant's vessels and these inspections were always made internally so that if there were any evidence of leakage it would have been disclosed. Any defective condition in caulking would have been revealed by leakage.

I accept Hansen's explanation of the proximate cause of the damage as more convincing than that of Captain Berne. Especially is this so because of the towing trip of the Milwaukee from Pier 3 to Pier 4.

It appears that the lighter was not taken directly from the south side of Pier 3 to Pier 4, but that it had been towed alongside an Army tug from the Army Base to Columbia Street. The tug master found conditions there so unsafe that he 'phoned his dispatcher and told him that the sea was breaking over the barges. Schaeffer, the master, continued: "and the barges were then towed six abreast, and the men on the barges were afraid she would not hold any more because the in-barges' lines were not holding properly * * *"

Thereupon Schaeffer had orders to take the Milwaukee to the south side of Pier 4. Schmidt, the dispatcher, called by the defendant, admitted that under the prevailing weather conditions the berth on the south side of Pier 3 was protected, whereas that on the outer end of Pier 4 was exposed to the strong westerly winds and rough seas. Schaeffer, the tug master, in answer to the question, "Was it safe?" answered: "I am not that good to say whether it was safe or not * * *. It was the safest spot available."

That the weather conditions were such as to require greater care on the part of the respondent than was given the scow during the period from the time it was taken from a safe, protected place to the exposed position in which it was found damaged two or three hours afterward, seems clear. The respondent must be held for that fault. Burns Bros. v. Cornell Steamboat Co., 2 Cir., 54 F.2d 532; C. F. Harms Co. v. Erie R. Co., 2 Cir., 167 F.2d

562; Tucker v. Tug Mathiasen Bros., 1932 A.M.C. 1619. The libellant may have a decree.

Appropriate findings of fact and conclusions of law in conformity with the foregoing opinion will presently be filed.