**CLEARY BROS. Inc. v. THE WYOMISSING et al.**

**LEHIGH VALLEY R. CO. v. THE WYOMISSING et al.**

**THE NO. 62.**

**THE EUREKA NO. 109.**

**THE LEHIGH VALLEY NO. 473.**

Nos. 18829, 18945.

United States District Court
E. D. New York.
April 16, 1953.

Foley & Martin, New York City, by Warren J. Martin, New York City, for libelant Cleary Bros., Inc.

Pyne, Lynch & Smith, New York City, by Vincent J. Ryan, Babylon, N. Y., for libelant Lehigh Valley R. Co.

Macklin, Speer, Hanan & McKernan, New York City, by Gerald J. McKernan, New York City, for respondent Reading Co.

Burlingham, Hupper & Kennedy, New York City, by Eugene Underwood, New York City, Robert F. Lynch, Long Island, N. Y., for respondent Berwind-White Coal Mining Co.

INCH, Chief Judge.

At about 11:30 P.M. on March 29, 1948, the tug Wyomissing arrived at the foot of 33rd Street, East River, with orders to tow the loaded coal barge Eureka 109 to 14th Street.

The tug there found the coal barge moored between a sand scow, the Penn 10, which was made fast to the bulkhead, and a large steel barge, the Eureka 117. All three boats were loaded. The bows of the Penn 10 and the Eureka 109 were headed upstream, and the bow of the Eureka 117 lay downstream. There was a strong flood tide with a. moderate southwesterly wind and good visibility.

In order to make the Eureka 109 available for towing, the tug made fast to the Eureka 117, which lay outside the Eureka 109, and moved the Eureka 117 a short distance downstream to a berth outside another deck scow which was moored to the bulkhead.

While this maneuver was being made the Eureka 109 went adrift and was carried upstream into collision with libelants' scow and gas hoist. These vessels subsequently broke loose and drifted upstream striking various objects en route. To recover for the damage sustained by their vessels, libelants bring these suits against the tug Wyomissing and the Eureka 109.

At the trial there was a serious conflict in the proof as to what caused the Eureka 109 to go adrift.

The following is the version of the accident urged by the owner of the Eureka 109 and which, in my judgment, is supported by a preponderance of the credible evidence:

The tug Wyomissing in moving the Eureka 117 downstream against the flood tide caused the stern of this loaded steel barge to rest heavily upon or come into collision with the Eureka 109. This contact pushed the smaller Eureka 109 ahead with a surge strong enough to part the "breast" or "spring" line which was amidships between the Eureka 109 and the Penn 10. The bargee of the Eureka 109, Carlson, seeing that his spring line had broken, looked aft and saw that his stern line had been freed from the after horn of the cleat and was rendering out. As the line rendered, the stern of the barge swung out into the river under the influence of the strong flood tide. Carlson was unable to secure the stern line, and it went overboard with its eye still on the cleat of the Penn 10.

By this time the bow of the Eureka 109 lay in contact with the outboard downriver corner of an oil barge which was moored ahead of it. Carlson was of the opinion that since the bow of the Eureka 109 was wedged against the oil barge with the full force of the flood tide against the port side of the 109, there was such an enormous strain on the bow line of the Eureka 109 that it would inevitably part the bow line or pull the side out of the Penn 10. Consequently, he ran forward and removed

the bow line from the port bow corner of the Eureka 109 in an attempt to move it over to the middle bow bitt to reduce the strain and to slack off enough line to allow the Eureka 109 to swing with the tide until her starboard side lay against the oil barge where he might again secure her. However, with the Eureka 109 drifting away from the Penn 10, this distance proved to be too great for the length of the bow line and the line went overboard, its eye still on the starboard bow bitt of the Penn 10.

On the other hand, it was the contention of the owner of the tug Wyomissing that while Carlson was attempting to take up the slack in his lines after the Eureka 117 had been towed away from him, he lost control of his lines. The tug's witnesses testified that Carlson told them after the accident that he had only a bow and stern line out, and that in attempting to "single up" or "take up the slack" in his stern line, it got away from him, that he then went up to the bow, but the bow line also got away from him, and that finally he tried to lasso a bitt on the Penn 10 with a spring line, but that in the process the spring line parted.

Carlson had had thirty years experience at sea on sailing vessels and had been around boats for forty-five years handling lines, and it is highly unlikely that a bargee of his experience would, in the absence of some unusual circumstances, have permitted "his lines to get away from him". He impressed me as a truthful witness, and after considering his testimony, together with the other evidence presented, I am satisfied that his version of the accident is the correct one.

It is undisputed that immediately prior to the accident the Eureka 109 was lying moored and at rest alongside the Penn 10 and that the only vessel maneuvering in the vicinity was the Wyomissing with the Eureka 117 in tow. The move which the Wyomissing was making with the heavily loaded Eureka 117, against the flood tide and in close quarters, could reasonably have caused the stern of the steel barge to rest heavily upon or come into collision with the stern of the Eureka 109. In addition to Carlson's testimony, there is the testimony of the bargee of the Eureka 117 that he "heard a riffle * * * it kind of shook me. * * * Then I heard a line part. I heard a line say, 'Pow'. Then I heard the captain tell the deckhand to shake it up because the other boat was coming adrift * * * *". Further, the tug's witnesses admitted finding the three lines aboard the Penn 10 which Carlson described, namely the unbroken bow and stern lines and the parted spring line with its eye on the midships bitt.

The testimony by the Wyomissing's crew that Carlson told them that he had put out the spring line after he had lost his bow and stern lines appears to me to be incredible. Carlson denied such a conversation, and it seems plain that by the time the bow and stern lines had gone overboard, the Eureka 109 would have drifted so far from the Penn 10 on the flood tide that it would have been physically impossible for Carlson to have thrown a seven inch spring line from the Eureka 109 and lassoed the middle bitt on the Penn 10 where the tug's crew found it. It is interesting to note that the tug's witnesses did not testify to the details of this alleged admission by Carlson when first asked about the substance of the conversation, but that they testified concerning it only after Carlson had testified and they were recalled to the witness stand.

Moreover, a disinterested witness, the captain of one of libelants' vessels, the Cleary No. 62, stated in his deposition that while the Eureka 109 was still adrift and in contact with his vessel, he asked Carlson "what happened— where he came from— * * * He said, 'I got knocked adrift in 30th Street.' That is all I know. That is what he told me." As the event was still going on, this conversation was part of the *res gestae* and is entitled to considerable probative value.

Thus, it is my conclusion that Carlson's version of the accident is sup-

ported by the weight of the credible evidence.

■ The Wyomissing contends that Carlson was at fault for attempting to shift his bow line from the port to the middle bow bitt while there was no line made fast to any part of his barge. However, the Wyomissing's master, Pryga, admitted that under the circumstances described by Carlson the Eureka 109's bow line would have rendered or broken. It is clear, therefore, that Carlson acted diligently in the emergency which the Wyomissing created and that the Eureka 109 is free from fault.

■ Libelants are entitled to a decree against the tug Wyomissing, and the libels should be dismissed as against the Eureka 109.

Submit proposed findings of fact and conclusions of law in accordance herewith.