**MARINE WELDING SERVICES INC., et al., Plaintiffs,**

v.

**B–R RIVER SERVICES, INC., et al., Defendants.**

MDL Docket No. 420 for Civ. A. Nos. C–1–78–0034–L(A), C–1–78–0052–L(A), C–1–78–0120–L(A), C–1–78–0133–L(A), C–1–78–0217–L(A) and C–1–80–0239.

United States District Court, S.D. Ohio, W.D.

Oct. 8, 1982.

E. Gerry Barker, Jeffersonville, Ind., Harold W. Thomas, Louisville, Ky., and Michael D. O'Keefe, St. Louis, Mo., Harry K. Herren, Jr., Woodward, Hobson & Fulton, Louisville, Ky., and Gary T. Sacks, Goldstein & Price, St. Louis, Mo., W. Scott Miller, Jr., Louisville, Ky., and James W. Herron, St. Louis, Mo., and Wm. P. Kardaras, New York City, for plaintiffs.

James G. Apple, Louisville, Ky., Stephen Leach, Trial Atty., Torts Branch—Civil Division, U.S. Dept. of Justice, Washington, D.C., for defendants.

## OPINION

DAVID S. PORTER, Senior District Judge:

### I.

On December 6, 1979, the defendants in these consolidated actions, B–R River Services, Inc., John P. Reisz and James R. Bennett, and the M/V BILL EDWARDS, and B–R River Services, Inc., as owner and operator of the M/V BILL EDWARDS, moved this Court for partial summary judgment in favor of B–R River Services, Inc., as owner and operator of the M/V BILL EDWARDS, and in favor of the M/V BILL EDWARDS. (doc. 64)

This limitation of liability proceeding arises from the breakaway of barges, during severe ice conditions, from the B–R River Services fleet at Louisville on January 28, 1978. Various plaintiffs in these consolidated actions had barges fleeted at the B–R River Services' barge fleet. Other plaintiffs had property or vessels located downriver from the B–R fleet which were damaged due to the breakaway.

B–R River Services' motion is based on the theory that, as a matter of law, the M/V BILL EDWARDS, *in rem.* and B–R River Services, as owners of the M/V BILL EDWARDS, *in personam,* may not be held liable for a fleet breakaway. The movants contend that if there is any liability for the breakaway, it turns on B–R's actions as a fleeting service rather than as vessel owner or operator. As the insurance coverages of B–R River Services in its capacity as a fleeting service are insufficient to cover damages asserted by plaintiffs in these actions, but the insurances on the M/V BILL EDWARDS combined with the fleeting insurances would cover all of the damages, resolution of this matter is important to all parties concerned.

There are two issues presented by this motion. The first is whether a vessel may be liable, *in rem,* when it is used in connection with fleeting services if barges break away from the fleet. The second issue is, assuming that a cause of action does lie *in rem* against the "fleet boat," whether in the matter before us, there are material issues of fact in dispute as to the negligence of the M/V BILL EDWARDS and the negligence of the principals, employees, and agents of B–R River Services, Inc. as owner of the vessel, thereby precluding summary judgment in their favor.

### II.

An *in rem* action exists in admiralty where a vessel is involved in a maritime tort. *See The Barnstable,* 181 U.S. 464, 21 S.Ct. 684, 45 L.Ed. 954 (1901). The theory behind the action is the personification of the ship as the party at fault. *See* Note, *Personification of Vessels,* 77 Harv.L.Rev. 1122, 1123 (1964).

> The ship is also, by the general maritime law, held responsible for the torts and misconduct of the master and crew thereof, whether arising from negligence or willful disregard of duty; ... upon the general policy of that law, which looks to the instrument itself ... as the best and surest pledge for the compensation and indemnity of the injured party.

*The Malek Adhel,* 43 U.S. 210, 234, 11 L.Ed. 239, 249 (2 How. 210, 234) (1844).

For example, admiralty courts have awarded judgments against tugs or other

vessels that have entered a fleet and caused barges to break away and suffer injury themselves and/or cause damage to other property. *John I. Hay Co. v. The Allen B. Wood,* 121 F.Supp. 704 (E.D.La.1954), aff'd sub nom *Martin Oil Service, Inc. v. John I. Hay Co.,* 219 F.2d 237 (5th Cir.1955); *Cleary Brothers, Inc. v. The Wyomissing,* 115 F.Supp. 99 (E.D.N.Y.1953).

■ Likewise, the placement of barges by a vessel at an unsafe berth, or one that is exposed to adverse weather conditions, gives rise to a maritime tort which creates a maritime lien against the vessel. *VICTORIA—The B.B. No. 21,* 54 F.2d 532 (2d Cir.1931) (evidence sustained finding that tug's placing of loaded coal boats in exposed berth in a dangerous place was the cause of sinking; judgment against vessel affirmed); *Herbert S. Keller—No. 302,* 19 F.2d 257 (S.D.N.Y.1927) (steam tug held liable for placement of barge in berth exposed to ice floes).

"The recognized rule has long been that a tug is bound to properly moor and make fast an unmanned barge it delivers, and that drifting which occurs within a short time thereafter, presumptively establishes fault on the part of the mooring vessel." *Pasco Marketing, Inc. v. Taylor Towing Service,* 554 F.2d 808, 811 (8th Cir.1977).

■ Admiralty courts also have imposed liability *in personam* on the owners of unseaworthy vessels, or vessels that otherwise have been involved in maritime torts. *See, e.g., Dow Chemical Co. v. Barge, UM–23B,* 287 F.Supp. 661 (E.D.La.1968) (owner of tug which failed to moor barge securely, held liable *in personam,* and tug held liable *in rem*).

■ Thus, assuming that some negligence of the M/V BILL EDWARDS caused or contributed to the damages in these consolidated actions, as a matter of law, the vessel and its owners and operators may be liable.

We must now determine whether there are material issues of·fact in dispute as to the negligence of the M/V BILL EDWARDS.

III.

■ Summary judgment is appropriate only where no genuine issue of material fact remains to be decided and the movant is entitled to judgment as a matter of law. *See In re Atlas Concrete Pipe, Inc.,* 668 F.2d 905, 909 (6th Cir.1982), *reh. denied* (March 9, 1982); Fed.R.Civ.P. 56(c). In ruling on a motion for summary judgment, the court must construe the evidence in the light most favorable to the party opposing the motion and against the movant. *State Mutual Life Assurance Co. v. Deer Creek Park,* 612 F.2d 259, 264 (6th Cir.1979); *Bohn Aluminum and Brass Corp. v. Storm King Corp.,* 303 F.2d 425, 427 (6th Cir.1962).

■ The movants here maintain that since it is undisputed that the barges which broke away in the actions before us were not in tow and were not attached to the M/V BILL EDWARDS, the vessel could not be responsible for the breakaway. They therefore contend that, as a matter of law, the vessel and its owner should be exonerated from liability.

We reject the movants' contention. It does not necessarily follow from the premise that the vessel was not attached to the fleet which broke away from its moorings, that the vessel could not be responsible for the breakaway. It is undisputed that:

1. B–R River Services, Inc. functioned at all material times as a fleeting service;

2. The M/V BILL EDWARDS was owned and operated by B–R River Services, Inc.;

3. The M/V BILL EDWARDS was present at the B–R fleet on the morning of Saturday, January 28, 1978, when the breakaway occurred;

4. Jim Bennett, the fleet manager, was also the master of the M/V BILL EDWARDS;

5. On the morning of the breakaway, Jim Bennett, a pilot, and a deckhand were present at the fleet;

6. On Friday, January 27, 1978, there were 12 loaded (or partially loaded) barges, 13 empty barges, a wharf barge, a crane barge, and a work barge in the B–R fleet;

7. The M/V BILL EDWARDS was used to move barges to and from the fleet, and within the fleet;

8. The M/V BILL EDWARDS moved barges to and from the fleet up to and including Wednesday, January 25, 1978;

9. The M/V BILL EDWARDS moved barges within the fleet as late as 2:00 p.m. on Friday, January 27, 1978;

10. During the morning hours before the breakaway, the engines on the M/V BILL EDWARDS were running at all times;

11. There were persons in the pilothouse and in the fleeting office who were monitoring the marine radio at all times during the morning of January 28, 1978;

12. At approximately 11:00 or 11:30 a.m. on Saturday, January 28, 1978, the barge breakaway occurred;

13. Jim Bennett, who was on board the M/V BILL EDWARDS, moved the vessel when the fleet started to "top out" to try to get the work barge out of danger;

14. After the loaded barges broke away from the upper fleet area, the M/V BILL EDWARDS was used to recover some of the loose barges which had moved downriver. See B–R River Services' Memorandum in Support of Motion for Partial Summary Judgment (doc. 64); Flowers Transportation, Inc.'s Supplemental Memorandum in Opposition to Motion for Partial Summary Judgment of B–R River Services, Inc. (doc. ——); and Supplemental Memorandum in Support of Motion of B–R River Services, Inc. for Partial Summary Judgment (doc. 111).

The parties opposing B–R River Services' motion contend that there is testimony to substantiate their position that the master and crew of the M/V BILL EDWARDS were negligent or that the vessel was unseaworthy. For example, Mr. Robert W. Green, III, who in 1978 was president of American Commercial Terminals, Inc., and had been in the business of building, designing and overseeing the construction and operation of terminals and mooring facilities, stated in his deposition that he was an eyewitness to the breakaway on January 28, 1978. He testified, *inter alia,* that the loaded B–R fleet appeared to him to be in an unsafe situation. He cited as reasons that: the fleet was tiered too wide; the loaded barges were placed upstream with their box ends facing upstream; head lines rather than breasting lines were used to moor the fleet; the fleet was moored to trees; no shear barge had been put up for protection, and the horsepower of the vessel was "too light" to protect the fleet. (Greene Dep. at 22, 23, 66, 75, 81, 85, 101); *see* Flowers' Supplemental Memorandum in Opposition to Motion at 6–8.

Another eyewitness to the breakaway was Marty Milby, pilot of the harbor boat, M/V JOE TAYLOR. He stated in his deposition that the B–R fleet was "awful wide," especially given the size of the fleet. (Milby Dep. at 26–27); *see* Flowers' Supplemental Memorandum in Opposition to Motion at 8. He testified that in the two days before the breakaway at the B–R fleet, the M/V JOE TAYLOR and its crew "thinned out" the fleet to which it was tending, put up shear barges, and double-rigged the barges.

There is also testimony by the ACBL's port captain, Norman Ivey, which supports a finding of negligence on the part of the M/V BILL EDWARDS. Although Ivey was not an eyewitness to the breakaway, he was on board the M/V JOHN MATTHEWS, which was located at the head of the Southland Fleet several thousand feet below the B–R fleet, from Thursday, January 26, 1978 until 7:00 a.m. on Saturday, January 28, 1978, the day of the breakaway. He viewed the B–R fleet from his position on the M/V JOHN MATTHEWS, through field glasses, and confirmed that he had a clear view of the B–R fleet. Ivey stated that "one wire is all we ever saw." (Ivey Dep. at 22) He further stated that based on his experience in managing fleets, he felt that one shore wire was inadequate to hold the 16–20 barges he saw in the B–R

fleet. (Ivey Dep. at 71–72) Ivey described the mooring of the B–R fleet as being outside the shore ice and "cocked out" so that the downstream shoreward corner of the fleet was 150–200 feet from the bank, while the upstream shoreward corner was only 75–100 feet from the bank. (Ivey Dep. at 17, 21); *see* Flowers' Supplemental Memorandum in Opposition to Motion at 9–11.

Captain A.C. Shelton, master of the M/V JOHN MATTHEWS, explained in his deposition why he considered the mooring of the B–R fleet to be dangerous. Captain Shelton believed that the fleet was "tiered too wide … out into the current," and said that "they [the B–R fleet] stuck way out in the river…." (Shelton Dep. at 8). He explained that a fleet that was out past the water intake (which he estimated as extending approximately 100 feet out into the river) was exposed to the direct effect of the current combined with the forces of the eddy that works off of the water intake. He also stated that there was a bank shelf in the area of the B–R fleet, which offered some protection from the current. In his opinion, "anytime a fleet extends out past that [the shelf], you are going to get into a real strong current, and a real hard running drift…." (Shelton Dep. at 63–66) When asked what precautions he would have taken in light of the ice conditions in the river, he stated (over objection by counsel for B–R River Services):

> I wouldn't have fleeted it at all. I would have moved those barges down to the Portland Canal or gotten someone else to or else taken them to McBride [below McAlpine Lock & Dam].

(Shelton Dep. at 63–66); *see* Flowers' Supplemental Memorandum in Opposition to Motion at 12–13.

There is additional testimony discussed in the Supplemental Memorandum of Flowers Transportation, Inc., which corroborates the testimony of the others to the effect that, in the few days preceding the breakaway, the B–R fleet was in an insecure position. As stated in that memorandum, this presents the Court with

several issues of material fact regarding the negligence of the master and crew of the M/V BILL EDWARDS, the vessel's unseaworthiness, together with the negligence of the principals, employees, agents of B–R River Services, Inc. as owner of the M/V BILL EDWARDS:

1. Should the M/V BILL EDWARDS have moved some or all of its barges to a safer location?
2. Did the M/V BILL EDWARDS moor too many barges abreast given the rising water, ice in the river and location of the fleet?
3. Were the lines put out by the M/V BILL EDWARDS sufficient to hold the number and configuration of barges it had moored in the fleet?
4. Was the M/V BILL EDWARDS of sufficient horsepower to operate a fleet of the size and configuration of B–Rs?

Flowers' Supplemental Memorandum in Opposition to Motion at 14.

 Notwithstanding the extensive testimony suggesting negligence on the part of the M/V BILL EDWARDS, B–R River Services maintains that "all of the liability questions discussed by the claimants who have responded are issues directed against the operator of the fleeting service, not the vessel." B–R River Services' Supplemental Memorandum in Support of Motion at 3. In support of its argument, it notes that the shore lines holding the entire upper fleet were the lines which broke and caused the breakaway, and those lines were placed there by B–R employees who were employees of its fleeting service, and not crew members of the M/V BILL EDWARDS. *Id.* at 2. B–R Services further notes that

> the configuration of the fleet, and decisions as to whether any barges could or should be moved, were decisions made by the operator of the fleeting service, since that was the entity to whom the barges were bailed or consigned. Those decisions were not decisions by or for the vessel or its crew, since the vessel did not have custody or control of the barges at the time of the breakaway or at any time

reasonably near the time of the breakaway.

*Id.* at 2–3.

This argument is specious. First, it is undisputed that the M/V BILL EDWARDS moved barges to the fleet three days before the breakaway, and moved barges within the fleet less than 24 hours before the breakaway. As noted above, "the recognized rule has long been that a tug is bound to properly moor and make fast an unmanned barge it delivers, and that drifting which occurs within a short time thereafter, presumptively establishes fault on the part of the mooring vessel." *Pasco Marketing, Inc. v. Taylor Towing Service, Inc.,* 554 F.2d 808 (8th Cir.1977). This rule was applied in *Lancaster v. Ohio River Co.,* 446 F.Supp. 199 (N.D.Ill.1978).

The facts of *Lancaster* briefly were as follows: Ohio River Company contracted with Material Service, Inc. to have its barge towed to Cozzi Shipping yards. Material towed the barge to the Cozzi yards and moored the empty vessel there. Approximately five days later, after the barge had been filled with steel, it broke from its moorings and collided with the plaintiffs' vessels. It was undisputed that at the time the barge broke loose, a storm with 50 mile per hour winds was taking place. 446 F.Supp. at 201.

Material, like B–R River Services in the case before us, moved for summary judgment and argued that once it safely towed the barge to the Cozzi docks and properly moored it there, its responsibility for the barge had ended. It contended that it owed no duty to plaintiffs to see that the barge continued to be moored properly for the conditions that arose five days later. 446 F.Supp. at 202. In denying Material's motion for summary judgment, the district court stated:

While Material is correct in its statement of the law that a towing company's responsibility for its tow ceases upon the proper mooring of the tow at the final destination of the tow pursuant to the towage agreement; ... this court is of the opinion that a genuine issue of material fact exists as to whether Material properly moored Barge ORG 2525 to the Cozzi docks on November 5, 1975.

446 F.Supp. at 203. The court reasoned that

[while five days] does not appear to be a relatively short period of time, and weather conditions changed from the time of initial mooring to breakaway, the presumption raises enough of an inference to require this court to find controverted and disputed the propriety of Material's mooring on November 5, 1975 ... As disputed, Material's evidence of due care in mooring Barge ORG 2525 presented in its depositions and exhibits in support of the instant motion must be presented at a trial wherein issues of credibility can be considered.

Id. Likewise, in this case, a genuine issue of material fact exists as to the propriety of M/V BILL EDWARDS mooring of barges in the B–R fleet in the days preceding the breakaway.[1]

Moreover, the facts that the M/V BILL EDWARDS was "standing by" the fleet at the time of the breakaway, and that it was used to alleviate danger when the fleet began to "top out" and to recover barges which came loose, cut against the movants' argument that its duties to the fleet had terminated.

Finally, as argued in Dravo Mechling Corporation's Supplemental Memorandum in Opposition to B–R River Services' Motion for Summary Judgment, (doc. 85), the M/V BILL EDWARDS was an integral part of the B–R operation. The failure to use the vessel to narrow down the fleet, given the imminent ice conditions, and/or to take any

1. We recognize that the applicable standard is ordinary care, but in determining whether the master and crew of the M/V BILL EDWARDS exercised ordinary care, we note that the amount of care required increases in proportion to the danger that should reasonably be foreseen. In view of the awareness of the master and crew of the ice buildup, there is a genuine issue of material fact as to whether they exercised ordinary care under the circumstances.

number of other actions to safeguard the fleet, may have constituted negligence on the part of those in charge of the M/V BILL EDWARDS.

We agree with Dravo Mechling's position that "[i]t's not possible to run a fleeting service without the use of a fleet boat." The fleet boat is, as described by one counsel in this action, the "shepherd of the fleet." "One can neither herd sheep nor fleet barges without the use of a shepherd, and if the shepherd is negligent, either through action or inaction, then the shepherd, as well as the landowner is liable." Dravo Mechling's Supplemental Memorandum in Opposition to Motion at 8.

### ORDER

For the reasons stated in this Opinion, we find that genuine issues of material fact exist as to the negligence of the master and crew of the M/V BILL EDWARDS and as to the vessel's unseaworthiness. We therefore deny B–R River Services, Inc., et al.'s Motion for Partial Summary Judgment.

SO ORDERED.